# THE STATE ex rel. GOODNOW v. POLICE COMMISSIONERS OF KANSAS CITY, Appellants.

**In Banc, December 24, 1902.***

1. **APPELLATE JURISDICTION: State Statute and City Charter.**
The power of cities, organized under special charters pursuant to section 16 of article 9 of the Constitution, to adopt a charter that would have the effect of repealing a prior general State law, involves a constitutional question, and hence the Supreme Court has jurisdiction of the appeal in any case in which that power is drawn in question.

2. **CITY CHARTER AND STATE LAW: Paramount Authority: Constitutional Provision.** The constitutional provision authorizing certain cities to adopt charters for their own government expressly limits the power to a requirement that the charter so adopted must be "consistent with and subject to the Constitution and laws of this State."

3. ———: ———: **Discharge of Police.** A special charter of a city organized under section 16 of article 9 of the Constitution does not, in so far as it undertakes to control the employment and discharge of policemen, repeal or supersede an existent general State law relating to the same subject.

4. ———: ———: ———: **Governmental Matter.** The employment and discharge of police is a matter which primarily belongs to the State, in which every citizen of the State has an interest, and is not simply a matter of local concern.

5. ———: ———. **Policemen: Tenure: Determined by Statute.** The police commissioners of Kansas City and the policemen appointed by them hold their offices by virtue of the Act of 1874 (Laws 1874, p. 327) and the amendments thereto, and not by force of the city charter adopted by the people in 1889. The charter did not supersede or repeal those statutes.

6. ———: **Policemen: Discharge: Decreasing Number: Hearing.** Under the statute of 1874 authorizing the Board of Police Commissioners of Kansas City to appoint policemen and to "reduce the present or any future number of policemen as experience

---

* This opinion was certified to the Reporter on December 2, 1904, and hence its appearance out of its chronological order.

State ex rel. v. Police Commissioners.

may warrant,"the said board had authority in 1897, without no-
tice, hearing or complaint, to reduce the number of policemen
so that the pay of all the police force for the year might be
brought within the appropriation made by the Common Council
for the payment of the force.    The language of that statute
does not mean that the commissioners can reduce the number
of police only as the terms of the members expire.

*Held,* by **Valliant, J.,** dissenting, that the clauses of the statute,
the one authorizing the Common Council on recommendation
of the Board of Police Commissioners to increase the number
of policemen, and the other authorizing the Board to reduce
the number of policemen, are to be construed together.  The
one did not give the council power to increase the number by
adding certain individuals of its own selection; nor did the
other give the board power to remove certain individuals
without complaint and trial during the three years for which
they were appointed.  The clauses, when thus construed to-
gether, mean that the council may say that hereafter the po-
lice force shall contain so many men, and that the board in
like manner shall say that the police force shall consist of
only so many men.

7. ———: ———: ———: **Charges.** By the terms of the statute un-
der which a policeman was appointed for Kansas City, he
could not be removed for any reason personal to himself, except
upon charges, with notice and after trial, but he holds for a
term of three years subject to that term being reduced and sub-
ject to be removed, without notice, charges or trial, whenever
in the judgment of the board an emergency exists requiring a
reduction of the number of policemen.    (**Valliant, J.,** dis-
senting, in separate opinion.)

8. ———: ———: ———: ———: **Discretion.**    The Board of Po-
lice Commissioners of Kansas City are the sole and final ar-
biters of the existence of the necessity for reducing the number
of policemen.  Their action in such matter under the statutes
of 1874 and 1875 is not subject to judicial review.

Appeal from Jackson Circuit Court.—*Hon. E. P. Gates,*
Judge.

REVERSED.

*R. B. Middlebrook* for appellants.

(1)    It has now become definitely settled in Mis-
souri that special charters derived from constitutional

authority, like those now existing in St. Louis, Kansas City and St. Joseph, while they confer extensive powers on such cities, with reference to the management of matters of purely local municipal concern, yet in those matters in which the State at large has admittedly a vital interest (such as, for instance, elections, and the establishment of a board of police commissioners) the authority of the State remains unimpaired and unaffected by any attempts in these charters to regulate matters not purely and solely confined to local municipal affairs. Bagley v. St. Louis, 149 Mo. 122; State ex rel. v. Mason, 153 Mo. 23; Ewing v. Hoblitzelle, 85 Mo. 77; State ex rel. v. County Court, 34 Mo. 546; Diamond v. Cain, 21 La. Ann. 309. It follows that, in order to support the contention of the relators to the effect that the provisions of the Kansas City charter supersede the provisions of the police act of the General Assembly of 1874 the court must find that the police regulations of the kind attempted to be made by article 11 of the Kansas City charter of 1889 are matters of purely local municipal concern. This, of course, the court can not do. Such being the case, it seems inevitable that the police act of the General Assembly of Missouri of 1874, relating to Kansas City, which permits policemen to be discharged for the purpose of reducing the force, without a trial, and without charges being preferred, is the law which governs this case, and if the Kansas City charter of 1889 is in conflict with this act on this point, then, as stated by the Kansas City Court of Appeals, the act of the Legislature must prevail. (2) The alternative writ embodying the petition fails to state facts sufficient to constitute a cause of action whether the action be regarded as founded on the State law or upon the charters, for following reasons: (a) If founded on the State law the petition should state that the relators were not dismissed for the purpose of reducing the force. There are no implications going along with this petition or alternative writs in favor of the pleader. The

rule is exactly the reverse in mandamus proceedings.
(b)   If the proceeding is instituted under article 11 of.
the city charter, then the alternative writ should have
alleged that the board was not satisfied that they were
not the proper persons to discharge the duties of police
officers, because under section 22, article 11 of the char-
ter of 1889, where no complaints were filed against the
officers (and they allege that no complaints were filed)
such officers were not entitled to a hearing in the event
that the board itself concluded that the officers were not
the proper persons to discharge the duties of policemen.
State v. City of St. Paul, 81 Minn. 391.   (c)   The peti-
tion does not aver that the common council of Kansas
City have ever apportioned or appropriated any money
with which the city treasurer could honor a warrant if
one were drawn either in compliance with the alterna-
tive writ for $770 or even in compliance with the per-
emptory writs for smaller amounts, arrived at af-
ter a hearing in court, and ascertained after giving
credits for sums earned by relators during their ab-
sence from the force.   It must appear that there is a
fund on which to draw the warrants or the court will
not order a peremptory writ.   This essential allegation
is not found in the alternative writ or petition.   There
must be an appropriation by the Legislature (i. e., in
this case, the city council) to cover the claim before the
auditor (in this case, the police commissioners) can be
required to issue a warrant on the State Treasurer for
their payment.   State v. Jamel, 31 La. Ann. 142; State
v. Kenney, 9 Mont. 389; State v. Holliday, 65 Mo. 76;
Carr v. State, 127 Ind. 204; secs. 15 and 16, article 11,
p. 107, Kansas City charter; Laws 1874, p, 332, sec. 14;
Reading v. Bell, 4 Cal. 333; Stratton v. Green, 45 Cal.
151; Springer v. Green, 46 Cal. 73; State ex rel. v.
Brown, 144 Mo. 24.   The petition does not state that re-
lators, or any of them, ever demanded reinstatement be-
fore September 10, 1897.   This being so, they ought
not to be paid for the time that elapsed between their

dismissal (August 22, 1896) and the time when they offered to go back, and demanded their reinstatement and pay, i. e., September 10, 1897. And the city treasury ought not to be mulcted to pay police who did no work and who never demanded reinstatement (so far as the petitions show) until over one year and a month after their dismissal from the force. (3) In each of these cases the relators made demand for a specific amount of salary. Each demanded $770, and each asked for a warrant for that specific sum. It turned out as a result of the trial, however, that these respective demands were excessive; hence it follows that the police commissioners were right in not ordering or issuing warrants as requested and demanded. The respective judgments were for a less amount in every instance, thus varying from the demands. This is fatal. This court has very recently emphasized the importance of specific demands in mandamus cases, and excessive demands cannot form the basis of mandamus. State ex rel. v. Associated Press, 159 Mo. 421; Tapping on Mandamus, 282; 2 Spelling, Extr. Rel., sec. 3118; High, Ex. Legal Rem. (3 Ed.), secs. 41 and 358; Merrill on Mandamus, sec. 257; Burnet v. Auditor, 12 Ohio 54; Commonwealth v. Commissioners of Allegheny, 16 S. & R. 317. Not only must the petition for the alternative writ contain such specific allegations as to prior demand, met by refusal, but the judgment, if for relator, must be equally specific both as to the rights of the plaintiff and the obligations imposed on the defendant. State ex rel. v. Associated Press, 159 Mo. 421; Price v. Riverside, etc., 56 Cal. 431. (4) No constitutional question appears on the record; and the case ought to be remanded to the Kansas City Court of Appeals. Kirkwood v. Johnson, 141 Mo. 637; Vansandt v. Hobbs, 153 Mo. 656; Kirkwood v. Mer. H. Co., 160 Mo. 111; Clark v. Porter, 63 S. W. 89.

*Wallace, Wallace & Culbertson* for respondents.

(1)   Respondents attempt now to reopen the question of the jurisdiction of this court, notwithstanding the final determination of that question in the mandamus proceeding against the judges of the Kansas City Court of Appeals (152 Mo. 444).   The jurisdiction is clear upon two grounds: First, because a constitutional question is involved (the ground stated in the opinion of the court above referred to); and, second, because the title to an office under the State is involved (a ground which the court in its opinion said was not necessary to be considered).   We rely upon both grounds and did in the mandamus proceedings to remove the cases here.   But our position on the constitutional question is not quite accurately stated either by this court or the Court of Appeals.   It is not quite accurate to say that the relators based their rights on the city charter as against the act of 1874.   The relators claim that the commissioners had no right to discharge them as they did either under the charter or the act of 1874.   But the commissioners claimed that the act of 1874 governed in the matter as against the charter, that under that act they had a right to discharge the relators in order to reduce the police force, and that they were discharged for that purpose.   The allegation in the return that the relators were discharged for the purpose of reducing the force was denied by the answer to the return.   But notwithstanding that the trial court found for the relators, the Court of Appeals assumed, contrary to the finding of the lower court, that relators were discharged for the purpose of reducing the force (although they had nothing but the record proper before them), and so assuming decided that the act of 1874 authorized the commissioners to discharge the relators in the middle of their terms of office for the purpose of reducing the force, and that the act of 1874 controlled, and not the city charter.   It was the commis-

sioners who raised the constitutional question and not the relators, and on that the commissioners won in the Court of Appeals. How can the city counsellor contend that the law of 1874 governs in place of the freeholders' charter, and that under that law the relators have no case (neither of which proposition we concede) and at the same time contend that this court has no jurisdiction of the case? A constitutional question being involved in the case, this court has jurisdiction to decide the whole case and every point in it, notwithstanding they may hold that the constitutional question raised is not well taken. State v. Chandler, 132 Mo. 155; State ex rel. v. Francis, 95 Mo. 44. But the jurisdiction of this court is clear upon another ground (a ground relied on in the mandamus proceedings against the judges of the Kansas City Court of Appeals, and which the court said in that case was not necessary to be considered) and that is that the proceeding involves the title to an office under this State. Whether a policeman holds his title under the State law of 1874 or under the charter of Kansas City, adopted under the provisions of the Constitution of the State, it is clear that he is not only a State officer but also an officer under the State of Missouri. State ex rel. v. Rombauer, 101 Mo. 499; State v. Dierberger, 90 Mo. 396; State ex rel. v. Valle, 41 Mo. 29; State ex rel. v. Bus, 135 Mo. 325; 1 Dillon on Mun. Corp. (3 Ed.), note page 83; State ex rel. v. Walker, 132 Mo. 210; State ex rel. v. Mason, 153 Mo. 43. (2) The relators having been appointed and commissioned as patrolmen for a certain term of office, it was not within the power of the police board to discharge them during their terms summarily and without a hearing, either under the act of 1874 or the freeholders' charter of 1889. If the decision of this question is made to depend on the provisions of the charter, it has already been decided in the case of State ex rel. v. Vallins, 140 Mo. 523. But it should be conceded that the act of 1874, which first es-

tablished the police department of Kansas City, governs the board in the employment and dismissal of policeman, instead of the charter, and if it be further conceded that the relators were discharged in order that the force might be reduced, the action of the board cannot be justified by the provision of the act of 1874, relied on. There is no authority in that act for the discharge of a policeman during his term for the purpose of reducing the police force. To hold that a policeman may be discharged before the expiration of his term, summarily and without a hearing and without cause, for the purpose of reducing the force, would abrogate that part of section 6 which declares that "policemen shall be employed to serve for three years and be subject to removal only for cause after a hearing by the board." But full force and effect may be given the clause just mentioned without abrogating the clause authorizing the commissioners to reduce the force, for the force may be reduced by omitting to reappoint policemen as their terms expire. This construction gives effect to all the provisions of the section and must therefore be the proper one. That this construction is the correct one is also shown by the provisions of section 3. Reading these sections together there is but one possible construction, and that is that a policeman may be discharged during his term of office for one cause only and that for unfitness, after a hearing by the board, and that the board may reduce the force as experience may warrant by dropping men from the list as their terms expire. Attention is also called to the language of section 6, authorizing the board to appoint a permanent police force. It is not the intention of this law that the number of the regular force should be changed from day to day, so many to-day and so many to-morrow. An emergency force is provided for when necessary. The regular force is given permanency and fixed terms of office, and regard must be had to this in reducing the size of the regular force. In-

deed, it is the general rule as to the discharge of officers that where an officer is appointed during pleasure, or where the power of removal is discretionary, the power to remove may be exercised without notice or hearing, but where the appointment is during good behavior, or where the removal must be for cause, the power of removal can only be exercised when charges have been made against the accused and after notice, with a reasonable opportunity to be heard before the officer or board having the power to remove. State ex rel. v. St. Louis, 90 Mo. 19; State ex rel. v Walbridge, 119 Mo. 383; State ex rel. v. Police Commissioners, 14 Mo. App. 297; Dillon on Mun. Corp. (3 Ed.), secs. 250 to 254; Dullam v. Willson, 43 Mich. 393. (3) It is sufficient answer to appellants' contention that the remedy of the relators was a writ of certiorari from the circuit court to bring up the record of the police board, to say that it does not appear from the record before the court that there was any record of the police board. But conceding that there was such a record as that set forth in the return, the writ of certiorari does not afford an adequate and complete remedy. This writ can reach only defects which appear on the face of the record of the tribunal to which it is directed and which are jurisdictional in their nature; the merits cannot be examined into, and the extent of the relief is the quashing of the record. State ex rel. v. Smith, 101 Mo. 174; Railroad v. State Board, 64 Mo. 294; State ex rel. v. Edwards, 104 Mo. 125; State v. Police Commissioners, 14 Mo. App. 297. It would not restore the relators to the possession of their offices or enforce payment of their salaries. After the record is quashed by writ of certiorari the relators would still have to resort to the writ of mandamus to compel the board to restore them to their offices and draw the warrants for their salaries, unless the board should decide to do so voluntarily. "A remedy is adequate when it reaches the end intended and actually compels the performance of the

duty which has been neglected or refused. It must apply to the case and afford the particular right to which the party is entitled. Anything which falls short of that is not adequate or complete." State v. McCracken, 60 Mo. App. 655; Merrill on Mandamus, 53; State ex rel. v. Renick, 157 Mo. 292. Mandamus is the proper remedy to restore the relators to their offices and to obtain warrants for their salaries. St. Louis County Court v. Sparks, 10 Mo. 117; Sanford v. City of Kansas, 69 Mo. 466; Riley v. Kansas City, 31 Mo. App. 39; State ex rel. v. Walbridge, 153 Mo. 194; State ex rel. v. Mason, 153 Mo. 55; Gill v. Watertown, 9 Wis. 254; Linsay v. Luckett, 20 Tex. 516; Ex parte Wiley, 54 Ala. 226; High on Ext. Rem., secs. 67-69. The term of office and the salary being fixed, the drawing of the warrant is a ministerial act. High on Ext. Rem., sec. 105. There is no merit in the contention that these cases should be reversed and remanded because the amounts named in the judgments for the peremptory writs are less than the amounts named in the alternative writs and in the demand made prior to the bringing of the suits. The judgments themselves show the occasion of this difference. The trial court found that the amounts of the salaries of the relators were due as stated in the alternative writs, but deducted therefrom, at the instance of the defendants, the amounts earned by the relators respectively in the meantime. (a) If this was error it was an error committed against the relators, for the reason that the salary is attached to and is an incident of the office and does not depend upon the performance of the duties of the office. The right or title to the office draws with it the salary. It makes no difference that the relators performed no duties during this time or that they earned money in other ways. State ex rel. v. Walbridge, 153 Mo. 194. The judgments for the peremptory writs should have been for the amounts of the salaries due respectively without making any deduction for wages earned in

other ways. If the theory of an office, as contended for by the learned city counsellor, be correct, he himself would be compelled to account to the city for all receipts from the private practice of his profession as a lawyer before drawing the warrants for his salary as city counsellor, which would no doubt deprive him of any salary at all. (b) These deductions from the amounts of the relators' salaries were made by the court after hearing all the evidence as the judgments recite. No exception was taken at the time nor by motion for new trial nor in arrest. The presumption is, if it be conceded to be an error, that if the attention of the trial court had been called to it by the appellants it would have been corrected. How can this be now held to be reversible error when it was done at the instance and in favor of the complaining party and never objected to at the time or called to the court's attention by motion for new trial or in arrest of judgment? (c) Even under the most strained and technical construction of the authorities we do not believe it can be claimed that the mere fact that the peremptory writ specifies a smaller amount than named in the alternative writ constitutes reversible error. Especially can it not be claimed to be error when the decrease is in appellants' favor. The authorities in this State simply hold that where several things are asked in the alternative writ, and all cannot be granted, the peremptory writ will be denied. In the case at bar two things are asked—reinstatement and wages—and both are granted; the latter, after deducting certain amounts at appellants' instance. State ex rel. v. Field, 37 Mo. App. 100; People ex rel. v. Board of Supervisors, 142 N. Y. App. 271; People ex rel. v. Railroad, 58 N. Y. App. 152; Commissioners v. Jackson, 165 Ill. 17; People v. Morton, 49 N. Y. S. 760, 24 App. Div. 563; Howard v. Huron (S. D.), 60 N. W. 803; State v. Crites (Ohio), 26 N. E. 1052; State v. Weld (Minn), 40 N. W. 560.

MARSHALL, J.—This is a proceeding by mandamus, instituted in the circuit court of Jackson county, to compel the defendants to reinstate the relator as a policeman and to draw a warrant in his favor for salary while he was prevented by defendants from performing his duties as such policeman. The writ was made peremptory by the circuit court. The defendants appealed to the Kansas City Court of Appeals, where the judgment of the circuit court was reversed, and the Court of Appeals refused to certify the case to this court. [State ex rel. Goodnow v. Police Commissioners, 80 Mo. App. 206.] There were four other cases of like tenor as this case, that were adjudicated in the same way, at the same time. Thereupon the relators in all of the five cases obtained from this court a mandamus against the judges of the Kansas City Court of Appeals, compelling them to certify all of said cases to this court, which was accordingly done, and said cases have been heard by this court and are now for adjudication here. [State ex rel. Smith v. Smith et al., Judges, 152 Mo. 444.]

The record in the case consists of the pleadings, the judgment, the motion for new trial and the appeal. No evidence is preserved. The petition alleges, substantially, that the Board of Police Commissioners of Kansas City, on November 4, 1895, consisted of the Mayor and two commissioners; that "said board then acting for said city, and exercising the authority *conferred by law upon it, and by article XI of the charter of Kansas City,* adopted at a special election held in said city on the 8th day of April, 1889, and which became a law and went into effect on the 9th day of May, 1889," appointed relator a patrolman of the police force of Kansas City, and duly commissioned him as such, for a term of two and one-half years from that date; that relator duly qualified and entered upon his duties and continued in the performance thereof until

August 22, 1896, ''when the said Police Commissioners, without authority of law, dismissed and discharged him from his said office;'' that he was entitled to receive seventy dollars a month as such patrolman, and was entitled to hold said office for the full term of two and one-half years, but said Police Commissioners, composed of the Mayor and two commissioners, ''appointees of the Governor of the State of Missouri, by authority of law, said board, without authority of law, without notice, without cause, without any charge or complaint whatever, wrongfully and unlawfully dismissed plaintiff, ousted him from and deprived him of his office of a patrolman of the police force, and excluded him from the exercise of the functions of said office and from having and receiving the emoluments pertaining thereto.'' ''That under the laws of the State of Missouri, and the charter of Kansas City, Missouri, said Board of Police Commissioners had no right, power or authority to dismiss and discharge said relator, remove him from his said office and deprive him of the emoluments thereof without cause therefor, and without a notice to said relator and a hearing by said board. That said relator was dismissed and discharged without a notice to him, without cause, and without a hearing, by said board, and wrongfully and unlawfully deprived him of his said office and the benefits and compensation to be realized from the performance of the official functions pertaining thereto, for the residue of his said term.'' That relator on September 10, 1897, demanded to be reinstated and paid. The prayer is that the defendants be compelled to reinstate him and to draw a warrant for his salary while out of office. This action was begun on October 1, 1897.

The portions of the return necessary to be considered in the determination of this case, are as follows: that the defendants constitute the Board of Police Commissioners of Kansas City; that the relator was on May 4, 1894, appointed a patrolman of the police force

by the then Board of Police Commissioners, composed of the Mayor and the two commissioners appointed by the then Governor of Missouri, and continued to serve as such patrolman until August 22, 1896, when he was discharged by the then Board of Police Commissioners pursuant to the following order of said board:

"Whereas the City Council has failed and refused to make an appropriation to maintain the police department of this city as it is now constituted, and whereas the City Council has failed and refused to appropriate any money for the payment of the expenses of the department for the months of June and July, and whereas it is necessary to reduce the expenses of the department so that for the balance of the year the expenses shall be such as to bring the expenses for the whole year within the amount appropriated by the City Council, to-wit, $150,000, therefore be it resolved by the Board of Police Commissioners that the police force be reduced, so as to make the necessary reduction in the cost of maintaining the department, and for that purpose three sergeants and thirteen patrolmen be discharged from the force.

"And be it further resolved, that, for the reason above stated and because the board is satisfied that the following named persons now holding commissions are not proper persons to discharge the duties of police officers, they be discharged, to-wit: W. S. Campbell, Walter Whitsett, William Blockburger, Robert J. Miller, G. W. Longan, S. W. Nichols, John Hoboy, Jerry Hogan, John R. Hayes, E. R. — —, J. T. Wachs, S. E. Saels, W. H. Goodnow, C. L. Knight, S. G. Smith and F. S. Goodhugh. For the reasons above stated it is by the board ordered that the above named persons, and each of them, be and they and each of them are hereby discharged from the police force of Kansas City, Mo."

The passage of the above resolution was opposed by Mayor James M. Jones and the following substi-

tute was submitted by him for the action of the board and on vote was lost:

"As a substitute for the resolution offered by Commissioner Fyke and seconded by Commissioner Johnston, providing for certain dismissals from the police force, it is moved by Commissioner Jones that no such dismissals be made, the force being already inadequate in numbers, but that the pay-rolls for June and July be so revised and corrected by the board, and the salaries of the police department be so re-adjusted, that the same come within the apportionment of $150,000, making $12,255.20 for June and $12,664.73 for July, and for the remaining months of the present fiscal year the following amounts: August $12,664.73; September $12,256.20; October $12,664.73; November, $12,256.20; December, $12,664.73; January, $12,664.73; February, $11,439.12; March $12,664.73; two-thirds of April, $7,762.26; which amounts, with the $18,041.64 already paid for the last one-third and for May, make the entire total apportionment for the year of $150,000."

"The majority of said Board of Police Commissioners, at the time of the discharge of relator, were confronted with the alternative of either reducing the number of men employed or reducing the salaries of the policemen by revising and correcting and reducing such salaries, as suggested by Commissioner Jones; that the said salaries were no more than reasonable compensation and no more than the law provided should be given to policemen, for which reason, in the exercise of their discretion vested in them by law, the majority of said board on the 22d day of August, 1896, decided to reduce the number of policemen and officers on the force rather than to reduce the salary and compensation of such as were retained, and keep the entire number intact.

"That for and on account of the existence of the conditions set forth in said record, the then commissioners discharged the said relator; that the Common

Council of Kansas City, pursuant to law and the charter in such cases made and provided, at the beginning of the fiscal year 1896, first meeting of said council in said fiscal year, held on the 19th day of April 1896, apportioned the estimated revenue to be collected by said city during the fiscal year 1896, to the several departments of said city, and did then and there apportion the sum of $150,000 to the police department of said city to pay for the salaries of policemen, including relator's salary, and other expenses of running said department for the fiscal year of 1896.

"That it became apparent and was the fact which the then Board of Police Commissioners were obliged to and did take notice of, that the sum of money apportioned by said city and collected monthly from the current revenue of said city, was insufficient to pay the salaries and expenses of the police department; that in order to bring said department within the monthly appropriation ordinance passed by the Common Council and approved by the Mayor of Kansas City, it became necessary to economize in the expenditures of the police department, and the then Board of Police Commissioners were compelled, as a matter of financial necessity, to reduce the number of men employed as policemen; that it is provided by section 30, article 4, of the charter of Kansas City, in force now and at the time of the occurrences herein mentioned, that the Common Council of said city shall not appropriate any money for any purpose whatever in excess of the revenue of the fiscal year actually collected and in the treasury at the time of such appropriation and unappropriated, and it is further provided by said section that neither the Common Council, nor any officer of the city, except the comptroller in a single instance in the charter provided, shall have authority to make any contract or do any act binding Kansas City or imposing upon said city any liability to pay money, until a definite amount of money shall first have been appropriated for the liqui-

dation of all pecuniary liability of said city under said contract in consequence of said act, and the amount of said appropriation shall be the maximum limit of the liability of the city under any such contract or in consequence of any such act, and such contract or act shall be *ab initio* null and void as to the city for any further or other liability.

"That on August 22, 1896, a majority of the then Board of Police Commissioners were satisfied that the relator, who was then holding a commission under the said board, was not a proper person to discharge the duties of a police officer, policeman, or patrolman, for which reason said relator was at that time discharged by said board, acting by a majority vote. That ever since the organization of the Board of Police Commissioners in 1874, to-wit, for the period of 24 years, it has been the uninterrupted custom, practice and usage of the said Board of Police Commissioners, whenever it has been satisfied that any person holding a position under it was not a proper person to discharge the duties of a policeman or police officer, or patrolman, to discharge such person at any time, without any complaint having been made against him. That this custom is immemorial, continued and reasonable and has been acquiesced in and practiced by the said board, all patrolmen and officers and the public at large, ever since the organization of the said Board of Police Commissioners, as aforesaid, and pursuant thereto and relying thereon and also on the provisions of section 22, article XI, of the city charter of 1889, authorizing them so to do, the then Board of Police Commissioners discharged said relator; that relator acquiesced in his discharge and voluntarily severed his connection with said police force."

The reply is a general denial. As stated the circuit court ordered the defendants to reinstate the relator as a patrolman, and also draw a warrant for his pay for the time he was kept out, at the rate specified for

a patrolman, diminished by the amount the relator had earned in other ways during that time.

## I.

It is not at all clear from the petition whether the position of the relator is that the State statute of 1874 (Laws 1874, p. 327) creating the board of police commissioners of Kansas City, or that article XI of the charter of Kansas City adopted in April, 1889, purporting to create a board of police commissioners for Kansas City, is the controlling law. It will be noted that the petition charges that the relator was appointed by the Board of Police Commissioners, who were then acting for said city, "and exercising the authority conferred by law upon it, and by article XI of the charter of Kansas City," etc., and that the petition also charges "that under the laws of the State of Missouri, and the charter of Kansas City," the board had no right, power or authority to discharge relator without cause, without notice and without a hearing, as it is charged was done.

It will also be observed that the return claims that the right and power to discharge relator is conferred by section 22 of article XI of the charter of 1889. The charter is referred to as authority for discharging any person holding a position under the board who is deemed by the board not to be a proper person to discharge the duties of a policeman or police officer and the act of 1847 is referred to as authority for reducing the force. That is, the return justifies the discharge on two grounds, first, under the power of the board conferred by the State law to reduce the force at any time; and, second, under the power of the board conferred by section 22 of article XI of the city charter to discharge without notice, complaint or trial, any person holding a commission under them if the board is satisfied such person is not a proper person to discharge the duties of a police officer.

Thus both the petition and the return may be said to be double-barreled, in that, each rests partly upon the State statute and partly upon the city charter, but neither intimates that there is any conflict in fact or in a constitutional view between the two.

The relator, however, now contends that the board had no power to discharge him, under either the State law or under the city charter, but that so much of the State statute as permits the board to reduce the number of the police force at any time, does not authorize a reduction in the manner that was done in this case, but that it only authorizes a gradual reduction by not appointing patrolmen as the terms of the number it is desired to dispense with expire, and further, that if this is not the true construction to be placed upon the State statute, then the State statute was superseded and repealed by the adoption of the city charter in 1889.

It was upon this last contention that this court ordered this case certified to this court. That is, the court held that the power of cities, like Kansas City, organized under special charters, pursuant to section 16 of article 9 of the Constitution, to adopt a charter that would have the effect of repealing a prior general State law, involved a constitutional question, and hence this court had jurisdiction. Without this, this case could not be here.

In 1874 the General Assembly of Missouri passed an act entitled "An Act creating a board of police commissioners, and authorizing the appointment of a permanent police force for the city of Kansas." The first section of that act permitted the common council of Kansas City to pass all needful ordinances for preserving order, promoting peace and good order, but prohibited it from passing any ordinance conflicting or interfering with the powers of the board of police commissioners created by the act. The act created a board of three commissioners, to be appointed by the

Governor, and confirmed by the Senate. In 1875 (Laws 1875, p. 193) the act was amended so as to make the Mayor of Kansas City ex officio a member of the board, the other two commissioners to be appointed by the Governor, and confirmed by the Senate. The act of 1874 authorized the board to appoint, enroll and equip a permanent police force for said city. Section 6 of that act is as follows:

"Sec. 6. To enable said board to perform the duties imposed upon them, they are hereby authorized and required, as speedily as may be, to appoint, enroll and employ a permanent police force for the City of Kansas, which they shall equip and arm as they may judge necessary. The number of policemen to be so appointed and employed, exclusive of officers, shall, at the first organization, be not exceeding the number now employed by the corporate authorities of the City of Kansas; but the Common Council of said city shall have power to increase the police force at any time to any number recommended by the Board of Police Commissioners; *and said commissioners may reduce the present or any future number of police as experience may warrant.* Provided, however, that for extraordinary emergencies, the board of police may raise such additional force as the exigency may in their judgment demand. No person shall be appointed or employed as regular policeman or officer of police who shall have been convicted of, or against whom any indictment may be pending for, any offense the punishment for which may be confinement in the State penitentiary, nor shall any person be so appointed who is of notoriously bad character, or who is not a citizen of the United States, or who is not able to read and write the English language, or who does not possess ordinary physical strength and courage. The policemen shall be employed to serve for three years, and be subject to removal only for cause after a hearing by the board, who are hereby invested with exclusive jurisdiction in the

premises. Any policeman whose term of service shall expire, and who during his appointment shall have faithfully performed his duty, shall, if otherwise qualified, be preferred by the board in making their new appointments.''

In 1889 Kansas City adopted a special charter, pursuant to the power conferred upon cities of over one hundred thousand inhabitants, by section 16 of article 9 of the Constitution. By article XI of that charter, the city undertook to create and establish a board of police commissioners and to authorize them to appoint a police force of its own. The charter in many respects is similar to the State law, as, in providing that the Mayor shall be ex- officio a member and that the other two commissioners shall be appointed by the Governor and confirmed by the Senate, but in many other respects there is a radical difference between the charter and the State law, as, for instance, under the State law the police are declared to be both city and State officers (Laws 1874, sec. 18, p. 333) while under the charter (sec. 20, art. XI, charter) the police are declared to be simply city officers.

In respect to the power of the board to appoint, remove, reduce and discharge there is a great difference between section 6 of the act of 1874, above set out, and section 22 of article XI of the charter, the charter provision, which is the only provision regulating the discharge of members of the police, being as follows:

"Sec. 22. *Policemen—First appointment—Probation—Term of—Removal—Jurisdiction of Board—Discharge of Police.* The first employment of policemen shall be for a probationary term of six months; and the board of police may in its discretion discontinue their services at any time. Having served six months probationary service to the satisfaction of the board such policemen may be appointed for a term of three years, and in case complaint be made against

them they shall be subject to removal only for cause, after a hearing by the board, and said board is hereby invested with exclusive jurisdiction in such matters. Whenever the board is satisfied that any person holding a commission under them is not a proper person to discharge the duties of a police officer, he may be discharged at any time without any complaint having been made against him.''

The most conspicuous differences between the State law and the city charter in respect to the right to discharge or reduce the force are, first, the State statute gives the commissioners the express power to ''reduce the present or any future number of police as experience may warrant,'' whilst the city charter confers no such power. Second, the State law limited the number to the number employed by the city when the act went into effect, but gave the Common Council power to increase the number at any time to any number recommended by the board of police commissioners; whereas the city charter (sec. 24, art. 11) fixed the number of patrolmen ''not to exceed one to each one thousand inhabitants of the city, the estimate to be taken from the best known sources for obtaining such information, as may be prescribed by ordinance.'' Third, the State law provided for the appointment of officers of police, ''for such time as the board may determine, and be subject to removal by the board for cause, as in the case of policemen;'' whereas section 22 of article 11 of the charter, as construed by this court, in State ex rel. v. Vallins, 140 Mo. 523, permits the removal by the board of any officer of police, as differentiated from a policeman or patrolman or police officer, at any time, without notice, charges or hearing, if the board does not think he is a proper person to discharge the duties of a police officer. Fourth, the State law provides that the policemen, patrolmen or police officer, that is, the private as distinguished from the officers of police, shall be employed for a

term of three years, whereas the charter provides that they shall be first employed for a probationary term of six months, during which they may be discharged at any time in the discretion of the board, and, if satisfactory, shall at the end of the probation be appointed for a term of three years. Other lesser, important differences exist, but are not material in this case.

Under the decision of this court in the case of State ex rel. v. Vallins, 140 Mo. 523, so much of the order of the defendants as predicated a right to discharge relator under the terms of the charter because the board did not think he was a proper person to discharge the duties of a police officer, is void and affords no defense, for the reason that the relator is not an officer of police but is a private of police, and that provision of the charter applies only to officers of police.

In fact, if the charter of Kansas City is the law governing the case, the defendant's return shows no defense whatever, and the discharge of the relator was without authority.

On the other hand, if the State law still controls, the contention of the relator that the provision thereof giving the board power to reduce the number of police, "as experience may warrant," means that the number can be reduced only as the terms of the members expire and not as was done in this case, is equally untenable. For it is manifest that such a construction of that provision of the act gives the board no more power than it would have without that provision, that is, the power of non-appointment or of refusing to reappoint as the terms expire; and it is equally apparent that the law-makers intended by the provision authorizing a reduction of the number of police as experience may warrant to confer an express and additional power on the board, which they would not have had without this grant of power. The doctrine *"ut res valeat, magis quam pereat,"* applies. The provision must be construed as meaning something rather

than nothing. Construed as relator contends, it means nothing, confers no power that would not exist as fully as if no such provision was found in the act. The power to reduce the number of police as experience may warrant was evidently intended as the converse of the power conferred by the next succeeding sentence of section 6 of the act of 1874, to raise such additional force as the exigency may in their judgment demand in case of extraordinary emergencies. The position of these two grants of power in the same section of the act, shows that the lawmakers had in mind the fact that it might become necessary to reduce or to increase the police force as the exigencies of extraordinary emergencies required, and so in the same breath the power was expressly conferred. The relation of the two ideas to each other and their close connection with each other in the act, conclusively shows that prompt and efficient action, sufficient to meet the exigencies, was contemplated and authorized by the lawmakers, and that a gradual reduction as the terms of the privates expired was not the kind of reduction the law contemplated.

This narrows the case to this: Under the charter the relator was wrongfully discharged, but under the State law his discharge was legal. Which law governs? The Kansas City Court of Appeals, in an able and elaborate opinion, by ELLISON, J., held that the State law controlled, and that the discharge was legal, and that conclusion was right.

It is unnecessary, and would be futile at this time, to tread again the maizes of adjudication, perhaps to become lost in the labyrinth of the ingenious and divergent reasons which pervade the cases in respect to the power of the State over municipalities incorporated under article nine of the Constitution, and in respect to the power of municipalities to adopt charters regulating matters of mere local concern, with which the State at large has no concern, which have the effect of re-

pealing prior general State laws on the same subject, or which place such cities in respect to such matters beyond State control. The views of the author hereof on these questions are well known, and were expressed, in Owen v. Baer, 154 Mo. 434, at great length, with painful care, after exhaustive investigation, and with such poor results, that repetition or reiteration here would be offensive.

No discussion of such questions is appropriate in this case, for this court held in State ex rel. v. Mason, 153 Mo. l. c. 43, that an act creating a board of police commissioners and regulating the appointment of a police force for any city in this State is constitutional, and that such board and such metropolitan police officers are State officers. In that case GANTT, C. J., said: "Laws like these and those of other States providing a metropolitan police system for large cities, are based upon the elementary proposition that the protection of life, liberty and property and the preservation of the public peace and order in every part, division and subdivision of the State, is a governmental duty which devolves upon the State and not upon its municipalities any further than the State in its sovereignty may see fit to impose upon or delegate it to the muncipalities. The right to establish the peace and order of society is an inherent attribute of government, whatever its form, and is coextensive with the geographical limits thereof, and touching every part of its territory."

Hence the act of 1874 related to a matter which primarily belonged to the State, in which every citizen of the State had an interest, and which was therefore not simply a matter of local concern. This being true, no decision that has so far been rendered gives any color or countenance to the power of the city to repeal such a State law by adopting a special charter under section 16 of article 9 of the Constitution which con-

tains inconsistent or variant provisions touching the same subject.

In fact that section of the Constitution expressly provides that the city may adopt a charter for its own government, but it limits this by requiring that the charter so adopted must be "consistent with and subject to the Constitution and laws of this State."

It is proper in this connection to say that the question here involved was not decided in the case of State ex rel. v. Vallins, 140 Mo. 523, or in the case of State ex rel. Chapman v. Walbridge, 153 Mo. 194. In the Vallins case the act of 1874 was not called to the attention of this court, but the case was presented as if the city charter was the only authority for the existence of the police board of Kansas City, and the decision in that case was predicated solely upon an interpretation of the charter provisions and did not pass upon the constitutionality of the charter provisions. In the Walbridge case, no such question was involved, for the reason that there was no such attempt by the city of St. Louis by charter to repeal 'the State law creating the board of police commissioners. That case involved only an interpretation of the State law.

It follows, without more discussion or elaboration, that article XI of the charter of Kansas City, adopted in 1889, did not have the effect of superseding or repealing the act of 1874, and that so long as that act remains in force it is beyond the power of Kansas City to repeal it or to create a board of police commissioners or a police force of its own. It also follows that the defendants hold their officers by virtue of the act of 1874, and the amendments thereto, and not by force of the city charter, and that the same is true of the relator. It also follows that when relator was appointed a member of the police force, by virtue of the act of 1874, he accepted that appointment subject to all the terms and provisions of that act as fully as if those terms had been specified in his commission. By the

terms of that act he could not be removed for any reason personal to himself, except upon charges, with notice and after trial. But by the terms of that act he, like every one else similarly appointed, held for a term of three years, subject however to that term becoming reduced and subject to the possibility of removal, without notice, charges or trial, in the event that the exigencies of any extraordinary emergencies made it necessary, in the judgment of the board, to reduce the number of the police force, and of that necessity the board was the sole and final arbiter, and in such event any one, officer or private, of the force selected by the board could be discharged to meet the exigency.

Under the decision in State ex rel. v. Mason, supra, the failure of the municipality to provide the necessary funds to pay the force as then constituted, would not have been held by this court to present such an obstacle to the enforcement of the law as necessitated a reduction of the force, but by the same measure it cannot be here held that the action of the board in reducing the number for that reason, was unlawful or subject to judicial review.

These considerations draw with them the unavoidable conclusion that the circuit court erred in granting a peremptory writ of mandamus against the defendants, and hence its judgment is reversed. Inasmuch as the relator is not entitled to the relief sought, the cause is here dismissed at relator's cost.

*Burgess, C. J.,* and *Brace* and *Gantt, JJ.,* concur; *Sherwood, Robinson* and *Valliant, JJ.,* dissent.

### DISSENTING OPINION.

VALLIANT, J.—For the following reasons I am unable to concur in opinion of the court in this case:

The act of 1874 (Laws 1874, p. 327) looks to the appointment and maintenance of a permanent police force for Kansas City. It prescribes the numerical

standard of the force, or rather a rule by which the numerical strength shall be measured. That numerical standard once established it is the duty of the Board of Police Commissioners to keep the force up to it until the same is reduced according to law. The power to increase the number is given to the Common Council on the recommendation of the Board of Police Commissioners and in the same sentence the power is given the commissioners to reduce the force. The fixing of the numerical standard in the first place, its increase and its reduction, are all treated by the Legislature in one breath, as it were, and are all intended to apply to the one object, that is, the general standard of the force, and they have no relation to the appointment or the discharging of individuals. In the exercise of the authority conferred in that sentence, the governmental agency to whom it is instrusted would say: the police force for Kansas City shall consist of so many officers and so many men, or it would say the force shall be increased to so many men, or that it be reduced to such a number. In the exercise of the power conferred in that sentence the government agency appoints no one, neither does it discharge any one; the power there conferred is rather in the nature of legislative than executive function; it prescribes the standard of strength, but does not appoint to the office.

The language of the act is: "Sec. 6. To enable said board to perform the duties imposed upon them, they are hereby authorized and required, as speedily as may be, to appoint, enroll and employ a permanent police force for the City of Kansas, which they shall equip and arm as they may judge necessary." So far the act confers only power to appoint, equip, etc., the duty there prescribed is purely of administrative character, and it does not leave it to the commissioners to say of what number the police force shall consist, but the number or standard of measure is elsewhere in the

act fixed and until it is altered the police commissioners cannot lawfully refuse to appoint that number.

Then follows a new sentence: "The number of policemen to be so appointed and employed, exclusive of officers, shall, at the first organization, be not exceeding the number now employed by the corporate authorities of the City of Kansas; but the Common Council of said city shall have the power to increase the police force at any time to any number recommended by the Board of Police Commissioners; and said commissioners may reduce the present or any future number of police, as experience may warrant." In that sentence the power is given to the Common Council on recommendation of the board to increase and to the board to reduce the number of the force. The power committed to the council is of the same nature as that committed to the board, the one to increase, the other to reduce. Surely it was not intended to give the council the power to increase by adding certain individuals of its selection to the force; no more can it be said that it was intended to give the board power to reduce by discharging individuals. It meant that the council by ordinance should have the power to say that hereafter the police force of the city shall contain so many men, and in like manner the board shall by resolution say that hereafter the force shall consist of only so many men. The power conferred by the act is of the same nature in each case, and is to be exercised in the same or similar manner.

Further down in the same section is this: "The policemen shall be employed to serve for three years, and be subject to removal only for the cause after a hearing by the board, who are hereby invested with exclusive jurisdiction in the premises." That sentence is emphatic and its object cannot be mistaken. It is designed to confer an important and valuable right on the policemen. The right there conferred is not visionary, but very substantial. It means that the

policeman does not hold his office at the mere will of the commissioners, and it means that they shall not discharge him except for cause after due trial. But if the commissioners under the name of reducing the force have the power to discharge an individual, of what value is the clause in the statute saying that a policeman shall not be discharged except for cause after trial? If the construction given the clause conferring the power to reduce the force by the majority opinion is correct, then the policeman is absolutely at the mercy of the Board of Commissioners, and the clause essaying to give him a right to serve his term unless upon charges and conviction is set at naught.

It is a rule that a statute should be so construed as to give effect to all its parts if possible. If we construe the clause empowering the Board of Commissioners to reduce the force to mean that it may by resolution or other proper form say, in effect, that hereafter the police force shall consist of only so many men in the same way that the Common Council may say that it shall be increased to so many men, then it is in perfect harmony with the clause conferring on the policeman the right to remain for his term unless dismissed for cause after due trial.

In my opinion the relators were unlawfully discharged and they are entitled to the relief prayed.