George L. STEMMLER, Mrs. Conrad Sommer, C. B. Broussard, Frederick E. Busse, John F. X. Callanan, David M. Grant, Ralph A. Kinsella, Mel H. Krah, John J. Nally, Henry B. Pflager, William A. Webb and Frank L. G. Weiss, as Members of the Charter Board of Freeholders of the City of St. Louis, Missouri, Relators,

v.

Major B. EINSTEIN, as a Member of the Charter Board of Freeholders of the City of St. Louis, Missouri, and as the Chairman of the Committee on Employees, Supplies and Budget of the Charter Board of Freeholders, Respondent.

No. 45806.

Supreme Court of Missouri.

En Banc.

Dec. 10, 1956.

Rehearing Denied Jan. 14, 1957.

Dissenting Opinion Jan. 22, 1957.

468

Richmond C. Coburn, Thomas L. Croft, William B. Eldridge, St. Louis, for relators.

Dan P. Reardon, Joseph G. Stewart, St. Louis, for respondent.

HOLLINGSWORTH, Judge.

This is an original proceeding in mandamus. Relators, being twelve of the members of a Board of (thirteen) Freeholders of the City of St. Louis elected to prepare and submit a new or revised charter to the qualified voters of said city, seek our peremptory writ commanding respondent Einstein, the remaining member of said Board and chairman of one of its committees, to approve and certify a voucher for the sum of $500 in payment of an allegedly valid indebtedness of the Board to Governmental Research Institute for services rendered by the latter. Respondent challenges the authority of the Board to enter into a contract for such services and asserts that he might be exposed to criminal prosecution and civil liability if he should approve a voucher issued in payment of the questioned indebtedness.[1]

The issue presented by the pleadings requires us to determine a question that has become a matter of urgent public interest, to wit: whether, under the provisions of Sections 31–33, Article VI, of the Constitution of Missouri, V.A.M.S., the City of St. Louis is authorized or required to include, in a proposed new or revised charter, provisions for the exercise of county government, as set forth in Sections 18(a) to 18 (*l*), Article VI, which authorize counties having more than 85,000 inhabitants to frame and adopt charters for their own government.

The cause was briefed, orally argued and submitted upon an agreed statement.

According to the last decennial census of the United States, the City of St. Louis has a population of 856,800. On January 23, 1956, its duly enacted Ordinance No. 47,-690 was approved and became effective. Pursuant to the provisions of that ordinance, the aforesaid Board of Freeholders, on May 8, 1956, was elected by the qualified voters of the City "to prepare a new or revised Charter of said city, * * * all as provided for by Section 32, Article VI of the Constitution of the State of Missouri". The ordinance also provided that the new or revised charter should be completed within one year of the date of election of the Board.

Following its election, the Board organized, elected relator Stemmler as chairman of the Board and respondent was appointed chairman of the Committee on Employees, Supplies and Budget. Rules were adopted governing the meetings and operations of the Board and the City appropriated the sum of $50,000 for salaries, counsel, personnel, materials and expenses of the Board in the performance of its duties. Relator Stemmler, as chairman of the Board, and respondent Einstein, as chairman of the Committee on Employees, Supplies and Budget, were authorized to approve and certify by their joint signatures all expenditures of the Board.

On July 6, 1956, the Board, by resolution duly adopted, directed its chairman to instruct Governmental Research Institute to

1. Section 558.260 RSMo 1949, V.A.M.S., makes it a felony for any member of any board charged with the administration of any fund of a public nature to knowingly vote for disbursement of such fund for any purpose not authorized by law.

prepare and present to the Board "for its consideration proposed charter provisions relating to the number, kinds, manner of selection, terms of office and salaries of all county officers, other than judicial officers, including the following: Circuit Attorney, Clerk of the Circuit Court, Clerk of the Circuit Court for Criminal Causes, Clerk of the Court of Criminal Correction, Clerk of the Magistrates Court, Collector of Revenue, Constables, Coroner, License Collector, Prosecuting Attorney, Public Administrator, Recorder of Deeds, Sheriff and Treasurer, and relating to the powers and duties of the same"; and directed that the sum of $500 be paid to the Institute as a fee for such services. Upon the adoption of the resolution, respondent, who had abstained from voting thereon, advised the Board that there might be a legal question as to its power and authority to enact charter provisions dealing with the so-called "county offices" and that he was in doubt as to whether he could legally approve the expenditure and requested that he be furnished an opinion by the Board's counsel as to his rights, duties and personal risks, if any, in this connection. The chairman directed the Board's counsel to furnish respondent with such an opinion. On July 10, 1956, Governmental Research Institute presented its bill for services in the amount of $500. On the same date, a City of St. Louis departmental disbursement voucher, covering the payment of said bill, was presented to the chairman of the Board. The voucher was in standard form, was prepared for the signatures of Stemmler as chairman of the Board and respondent as chairman of the Committee on Employees, Supplies and Budget, and embodied a certificate that the account amounting to $500 was correct and the expenditure authorized and necessary. Stemmler signed the voucher and at the regular meeting of the Board of Freeholders on July 13, 1956, called upon respondent to approve, certify and sign the voucher. Respondent, however, refused to do so and still so refuses, basing his refusal upon the written opinion of the Board's regular counsel dated July 10, 1956, which advised respondent that by such action he might expose himself to personal liability of both a criminal and civil nature.

■ Due to the urgency of an early determination of the issue, we waived the provisions of our Rule 1.23, 42 V.A.M.S. See State ex rel. Cole v. Matthews, Mo., 274 S.W.2d 286. And we have concluded that the facts above recited justify the exercise of our jurisdiction to determine the case on the merits. Section 4, Article V, of the Constitution; State ex rel. State Board of Mediation v. Pigg, 362 Mo. 798, 244 S.W.2d 75.

Since the adoption of the Constitution of 1875, the City of St. Louis, by virtue of the provisions of Sections 20–26, Article IX, thereof, has been invested with and has exercised the powers of both a city and county, with the same power reserved over it by the General Assembly, however, under Section 23 of said Article, that it had over other cities and counties of the State. And such of its officers as have performed the functions and duties generally exercised by county officers have been held to be county officers and subject to the general laws of the State relating to the selection and duties of county officers, as distinguished from municipal officers. State ex rel. Walker v. Bus, 135 Mo. 325, 36 S.W. 636, 639, 33 L.R.A. 616; State on inf. of McKittrick v. Dwyer, 343 Mo. 973, 124 S.W.2d 1173, 1174–1176. It is also provided in Section 1.080 RSMo 1949, V.A.M.S.[2], that whenever the word "county" is used in any law general in character to the whole State, it shall be construed as applicable to the City of St. Louis unless such a construction be inconsistent with its evident intent or some law specially applicable to the city. But, although it constitutes a legal subdivision of the State and exercises such governmental functions as are generally exercised by the one hundred fourteen coun-

---

2. All statutory references herein are to RSMo 1949, V.A.M.S.

ties of this State, the City of St. Louis is not legislatively classified as a county, but as a city. Section 46.040. And the framers of the 1945 Constitution declared in Section 1 of Article VI that the "existing counties" were "recognized as legal subdivisions of the state".

Article VI of the Constitution of 1945 sets forth three instances in which local government may be enjoyed by cities and counties in this State. One of them is of general application to counties of more than 85,000 inhabitants, one is of general application to cities of more than 10,000 inhabitants, and one applies exclusively to the City of St. Louis. They are:

(1) Sections 18(a) to 18(*l*) are entirely new and novel in that they, for the first time in this State, authorize "any county having more than 85,000 inhabitants" to frame and adopt and amend a charter for its own government and provide that upon adoption of such a charter such county shall be a body corporate and politic. Section 18(b), which relators contend empowers the Board to adopt provisions for the exercise of county government by the city and to contract the $500 item of alleged indebtedness here in question, provides: "The charter shall provide for its amendment, for the form of the county government, the number, kinds, manner of selection, terms of office and salaries of the county officers, and for the exercise of all powers and duties of counties and county officers prescribed by the constitution and laws of the state." However, the number and qualification of the members of the Board of Freeholders provided for in Sections 18(f) and 18(g) and the method of their selection differ materially from those provided in Section 32(b), under which the city proceeded.[3]

(2) Section 19, not new in substance, except that the figure of "10,000" has been substituted for "100,000", authorizes any city having more than 10,000 inhabitants to frame and adopt a charter consistent with and subject to the constitution and laws of the State, and provides a procedure that is different in its details from that followed by the city in the instant matter.

(3) Sections 31–33 deal exclusively with the power of the City of St. Louis to establish local self-government:

Section 31 provides: "The City of St. Louis, as now existing, is recognized both as a city and as a county unless otherwise changed in accordance with the provisions of this constitution. As a city it shall continue for city purposes with its present charter, subject to changes and amendments provided by the constitution or by law, and with the powers, organization, rights and privileges permitted by this constitution or by law."

Section 32(b), under which Ordinance No. 47,690 was enacted, provides: "The lawmaking body of the city may order an election by the qualified voters of the city of a board of thirteen freeholders of such city to prepare a new or revised charter of the city, which shall be in harmony with the constitution and laws of the state, and shall provide, among other things for a chief executive and a house or houses of legislation to be elected by general ticket or by wards. Such new or revised charter shall be submitted to the qualified voters of the city at

3. Section 18(f) provides: "Whenever a petition for a commission, signed by qualified electors of the county numbering twenty percent of the total vote for governor in the county at the last preceding general election, is filed with the county court or other governing body, the officer or body canvassing election returns shall forthwith finally determine the sufficiency thereof and certify the result to the governing body, which shall give immediate written notice of the petition to the circuit and probate judges of the county." Section 18(g) provides: "Within sixty days thereafter said judges shall appoint a commission to frame the charter, consisting of fourteen freeholders who shall serve without pay and be equally divided between the two political parties casting the greater number of votes for governor at the last preceding general election."

an election to be held not less than twenty nor more than thirty days after the order therefor, and if a majority of the qualified voters voting at the election ratify the new or revised charter, then said charter shall become the organic law of the city and shall take effect, except as otherwise therein provided, sixty days thereafter, and supersede the old charter of the city and amendments thereto."

Relators assert that although the Board of Freeholders was selected pursuant to the provisions of Section 32(b), and contrary to the provisions of Sections 18(f) and 18 (g), it nevertheless has authority and it is its duty [4] to include in its proposed charter provisions fixing the number, kinds, manner of selection, terms of office and salaries of county officers pursuant to the requirements of Section 18(b).

In support of that contention, relators point out that if, under the Constitution of 1945, it is necessary for a board of freeholders to be organized under Sections 18 (a) to 18(l) in order to frame a charter dealing with the county powers of the city, then it would be equally true that it would be necessary to organize another board of freeholders pursuant to Section 19 (authorizing all cities of over 10,000 to adopt charters) to frame a charter for administration of its municipal powers; and that the conflicting powers and limitations of such boards would produce an unworkable result, not intended by the framers of the Constitution. In this connection, our attention is called to Sec. 50.010 of the statutes as evidence that the Legislature interprets Sec-

tions 31–33 to give to the Board of Freeholders therein designated authority to draft a charter for the exercise of its county functions as is prescribed in Section 18(b) of the Constitution. Section 50.010, supra, provides: "Unless otherwise provided in a charter adopted by a county under the provisions of sections 18 or 31, 32 and 33 of article VI, of the constitution of this state, the fiscal year of the several counties of the state shall commence on January first * * *."

Section 50.010 is not to be ignored in consideration of the issues here involved, and yet it is evident that the primary purpose of the opening clause of that section was to avoid any possibility of attempting to fix the fiscal year of any subdivision of the State over which the General Assembly might not have jurisdiction and that the clause stressed by relators was precautionary, rather than a legislative declaration of the scope of Sections 31 to 33.

Relators also stress Section 1.080 of the statutes (declaring that when the word "county" is used in any general law applicable to the whole State it shall be construed as applicable to the City of St. Louis unless inconsistent with its evident intent or some law specially applicable to the city) as a basis for its assertion that Sections 31–33 of the Constitution are to be construed to include the powers (and duties) with which counties of more than 85,000 inhabitants are invested by Section 18(b). We may and do assume for the purpose of this opinion that the phrase "any law, general in its character to the whole state", as used in

---

4. For some reason unexplained in the record, the Board neither claims any duty, nor does it assert any right, to include within a proposed charter the further mandatory provision of Section 18(b) that such a charter shall provide "for the exercise of all powers and duties of counties and county officers prescribed by the constitution and laws of the state", which, we have held, requires provision for such peace officers as are necessary to perform the duties enjoined upon county peace officers. State on inf. of Dalton, ex rel. Shepley v. Gamble,

Mo., 280 S.W.2d 656, 660–662. In fact, we understand that the present Board of Freeholders proposes to give to the Sheriff of the City of St. Louis only those powers of preserving the peace as are presently enjoyed by him, to wit: the power and duty to act under the control of the State appointed police board, as provided by § 84.200 RSMo 1949, V.A. M.S., and that it also proposes to leave the city's police department under the jurisdiction of the State, as it is now constituted and functions under §§ 84.010 to 84.340 of the statutes.

Section 1.080, may be construed to include within its meaning and purpose the sections of the Constitution under consideration in determining *the true intent and meaning of the latter.*

 Relators assure us that if Sections 31–33 of the Constitution *permit* its Board of Freeholders elected under Ordinance 47,690 to include county functions in a proposed charter, it does not mean that such a charter can preempt generally the legislative field from the General Assembly, citing State ex rel. United Railways Co. v. Public Service Commission, 270 Mo. 429, 192 S.W. 958, 198 S.W. 872. It is not clear why relators inject this theme into their case on the merits. But, whatever their purpose may be, there can be no gainsaying that if the city is empowered to and does adopt a charter for the exercise of county government as provided in Section 18(b), the express terms thereof forbid its assuming only a portion of the powers therein enumerated. That section declares that any charter adopted under authority of Section 18(a) *"shall provide * * * for the exercise of all powers and duties of counties and county officers * * *",* and Section 18(e) further limits legislative jurisdiction over a county exercising charter powers.[5] These sections make sweeping limitations upon the power of the General Assembly to enact laws relating to the government of a county so chartered. Such limitations can, of course, be made but the intent to do so must either expressly appear or its implication be clear, strong and convincing, if not, as has been said, absolutely necessary. McGrew v. Missouri Pac. Ry. Co., 230 Mo. 496, 132 S.W. 1076, 1083–1084. See also State v. Shelby, 333 Mo. 1036, 64 S.W.2d 269, 271 [1–4]; State ex rel. Hughes v. Southwestern Bell Telephone Co., 352 Mo. 715, 179 S.W.2d 77, 80 [3–5]. In determining the intent and applicability of Sections 18(a) to 18(*l*) and whether the framers of the Constitution intended that their provisions be read into and made a part of Sections 31–33, we must read and consider them in context with all other pertinent provisions of the Constitution and the public policy of the State as presently declared by the Legislature. State ex rel. Carroll v. Becker, 329 Mo. 501, 45 S.W.2d 533, affirmed 285 U.S. 380, 52 S.Ct. 402, 76 L.Ed. 807.

Prior to the adoption of the 1945 Constitution, the people of Missouri, acting through the General Assembly, for many years zealously reserved unto themselves and exercised complete jurisdiction and control over the police departments of both their two large cities, to wit: The City of St. Louis and Kansas City. This was done upon the theory that the maintenance of peace and order in these large and congested areas was a matter of statewide concern. State ex rel. Hawes (of the Board of Police Commissioners of the City of St. Louis) v. Mason, 153 Mo. 23, 54 S.W. 524; State ex rel. Goodnow v. Police Commissioners of Kansas City, 184 Mo. 109, 71 S.W. 215, 88 S.W. 27. That continues to be the policy of this State unless it was changed by Sections 18(a) to 18(*l*) of the 1945 Constitution. Sections 84.010 to 84.-860.

In the Mason case, supra, 153 Mo. loc. cit. 43, 54 S.W. loc. cit. 529, it was said: "Laws like these, and those of other states providing a metropolitan police system for large cities, are based upon the elementary proposition that the protection of life, liberty, and property, and the preservation of the public peace and order, in every part, division, and subdivision of the state, is a governmental duty which devolves upon the state, and not upon its municipalities, any farther than the state, in its sovereignty, may see fit to impose upon or delegate it to

---

5. Section 18(e): "Laws shall be enacted providing for free and open elections in such counties, and laws may be enacted providing the number and salaries of the judicial officers therein as provided by this constitution and by law, but no law shall provide for any other office or employee of the county or fix the salary of any of its officers or employees."

the municipalities." Now, if Sections 18(a) to 18(*l*) are construed to be read into Sections 31–33, applicable exclusively to the City of St. Louis, then the City of St. Louis, the larger of the two principal cities of this State, if it elects to adopt a charter of county government, is undeniably invested with the power, and, we have said, the duty, to take over such functions of its police department as are necessary to the preservation of the peace, safety and property rights of its citizens and the effective enforcement of such other powers as was priorly exercised by counties as an agency of State government. In the recent case of State on inf. of Dalton ex rel. Shepley v. Gamble, Mo., 280 S.W.2d 656, 660, we said: "A county under the special charter provisions of our constitution is possessed to a limited extent of a dual nature and functions in a dual capacity. It must perform state functions over the entire county and may perform functions of a local or municipal nature at least in the unincorporated parts of the county. These are constitutional grants which are not subject to, but take precedence over, the legislative power." Exercise of the powers given to counties in these sections by the City of St. Louis would place its police department beyond the control of the Legislature and yet would leave the Kansas City police department under its jurisdiction. Sections 84.350 to 84.860. Surely, the framers of the Constitution did not contemplate the creation of such an anomaly. We must determine whether it actually did.

Relators say that by the adoption of Sections 31–33 the framers of the Constitution took cognizance of the dual character of the City of St. Louis as it had existed ever since adoption of the Constitution of 1875 and gave it "special treatment", and that Section 31 merely continues that dual character by recognizing it both as a county and as a city. That is self-evident. But the question is: With what dual governmental powers is this dual institution invested? Does it consist of two separate and distinct corporate and political entities, or are its dual functions, not unlike Siamese twins, conjoined in one corporate and political body? Obviously, the latter would have problems peculiar to its dual but conjoined existence. So, admittedly, does the City of St. Louis. The "special treatment" given it by Sections 31–33 is a wise recognition of that fact.

To "recognize" the city's dual capacity was merely to formally acknowledge with approval its prior status as a legal subdivision of the State as it had theretofore existed. The expression of recognition of its prior status refutes any idea of creating a new county or legal subdivision of the State or to invest it with additional powers. Therefore, the question is whether, as it priorly existed and by the Constitution of 1945 continues to exist, does it now, independently of its existence as a municipality, also constitute a *de jure* county within the meaning and intent of those Constitutions? An analysis of both Constitutions and of our statutes tends strongly to show it does not. The reason, we think, is apparent.

The City of St. Louis is a great metropolis that has none of the attributes of the usual concept of a county, such as areas in which there is no municipal or local government. But it is more than that: it is also a city which, due to the fact that it is not within the territorial limits of a county, must exercise county functions as an integral part of state government; and it exercises and must continue to exercise those functions in the manner and within the limits fixed by the Legislature, except, to the extent that the Constitution of 1945 has expressly or by clear implication taken those powers from the Legislature and vested them in the electorate of the City. State ex rel. Spink v. Kemp, Mo., 283 S.W. 2d 502, 514–515 [4–6].

Sections 31–33, Article VI, reveal no intent to invest the city with authority to frame and adopt a charter for the exercise of county governmental functions. Admittedly, the city had none prior to the

adoption of the 1945 Constitution and it is a striking fact that the powers given it by Sections 32(a) and (b), with the exception of minor changes in phraseology, are identical with those set forth in the Constitution of 1875, Sections 20–25, Article IX. As stated, the first sentence of Section 31 invests the city with no new powers. The second sentence of that section says of the City of St. Louis that *"as a city* it shall continue *for city purposes* with its present charter", and that it may amend that charter. The provisions of 32(b), under which the Board of Freeholders involved in this litigation is proceeding, are of also special significance. They authorize the Board to prepare a new or revised charter *"of the city";* that the charter shall provide *"for a chief executive and a house or houses of legislation"*; and that such charter, when enacted, shall become *"the organic law of the city"*. Section 33 provides for the authentication of the new or revised *"charter of the city of St. Louis"*. It is hardly conceivable that the framers of the new Constitution, many of whom were fully aware of the distinction between county governmental functions and those of local or municipal government, would have permitted the language of the Constitution of 1875, which all of them knew did not authorize the city to adopt a charter including powers of county government, to remain so obviously restricted to municipal government had they intended that the city should take over the functions of county government.

But, say relators, despite the fact that Sections 31–33 deal exclusively with the City of St. Louis, nevertheless, it is also a county of more than 85,000 inhabitants and the framers of the Constitution intended that it be so classified within the meaning of Sections 18(a) to 18(*l*) insofar as they can be made to apply and, it seems, insofar as the city may elect to exercise them.

We think it clear that each of Sections 18(a) to (*l*) is intended as an integral part of a single plan, with which any county authorized and desiring to frame, adopt or amend a charter for its own government must substantially comply; at least, that it must comply with every limitation therein made a prerequisite to the adoption of charter powers. But study of this plan shows Sections 18(f), 18(g), 18(h) and 18(j) contain provisions with which such a county is required to comply before any charter submitted by it can be lawfully adopted that are in direct conflict with the charter powers given the City of St. Louis in Sections 31–33. Section 18(b) not only gives a county of more than 85,000 inhabitants power, but *requires* it to provide its own form of government, while Section 32(b), under which the city must operate, restricts the form of government to "a chief executive and a house or houses of legislation to be elected". Section 18(f) requires that proceedings for a county charter must be initiated by means of a petition signed by twenty percent of the electors, and for subsequent procedures directly in conflict with Sections 31–33. Section 18(g) provides for the appointment of a commission of fourteen freeholders to be appointed by the circuit and probate judges of the county and that membership on the Board of Freeholders thus selected be equally divided between the two major political parties, each of which provisions is repugnant to the method provided for the selection of the Board provided for in Section 32(b). Section 18(h) authorizes a separate vote on any part of the charter submitted; Section 32(b), pursuant to which the Board is functioning, contains no such provision.

The absence of any clause or phrase in Sections 18(a) to 18(*l*) evidencing an intent that the procedure therein required for a county of more than 85,000 inhabitants to enact a charter form of government is applicable to the City of St. Louis (when considered in connection with the absence of any suggestion in Sections 31–33 that the city was delegated any such power) is most persuasive that Sections 18(a) to 18(*l*)

were never intended to apply to the City of St. Louis.

■ We are convinced that the city, purporting to act in accord with Sections 31–33, may not reach into Sections 18(a) to 18(*l*), extract a portion of 18(b) out of context and use it as constitutional authority for adoption by it of one or more of the functions therein imposed upon all counties operating under special charters, and at the same time ignore all of the requirements of Sections 18(a) to 18(*l*) as to the procedure required before any county can procure such a charter and, indeed, then go further and obtain such a charter under a procedure that in terms relates solely to a charter for city government. See Castilo v. State Highway Commission, 312 Mo. 244, 279 S.W. 673, 677 [5].

The debates of the 1944 Constitutional Convention lend much color to our conclusions and it is proper to consult the proceedings and debates of the Convention even though they are not of binding force and their value depends upon the circumstances of each case. State on inf. of Dalton ex rel. Shepley v. Gamble, Mo., 280 S. W.2d 656, 661 [9]. These debates, insofar as they relate to what are now Sections 18(a) to 18(*l*), are set forth through pages 2094–2101, 2105–2163.

At page 2095, Senator McReynolds said of Sections 18(a) to 18(*l*), (then referred to as Section 20):

"In fact, the only counties that come within the present provision, and this is an elaborately written and carefully prepared plan, are counties the size of Buchanan and above. That would mean Buchanan County and Jackson County and St. Louis County and Greene."

At page 2097, Mr. Bradshaw said:

"Here in Missouri the provision of eighty-five thousand would apply to four of our one hundred and fourteen counties excluding for this purpose the county of the City of St. Louis."

At page 2098, Mr. Bradshaw also said:

"I have advocated in the past years the home rule for counties for St. Louis and Jackson, particularly, and I think it appropriate that it be applied to Greene and Buchanan but I doubt the advisability of applying it to all the counties in the State."

On page 2112, Senator McReynolds said:

"You must remember, sir, that here is a particular charter which had been worked out by the representatives of four counties to fit their situation. Now, there is no general principle involved because this is not worked out to take care of anything except their particular problem, and they have a right to work it out that way and ought to have worked out, and it is acceptable to them."

At page 2147, Mr. Charles H. Mayer said:

"As for the length of this Constitution about which Mr. Kirk spoke, the people in the four counties affected number about a million fifteen thousand. * * * Now, why deny it to us and why have it denied to us by gentlemen who are not affected by it? Mr. Ford speaks of the effect upon St. Louis City. It doesn't apply to St. Louis City at all. St. Louis City is not concerned with it so far as I know. There may be a delegate or two in St. Louis who thinks that it isn't a good thing. If they do, they have a perfect right to vote against it, but it doesn't affect the City of St. Louis at all."

No delegate, insofar as we have been able to find, ever at any time during the convention disputed or questioned the above assertions of the delegates who were engaged in presentation of the matter.

In their reply brief, relators direct our attention to a statement of Mr. Hullverson at page 2115, as follows:

"In view of the difficulty with this Section, I might mention that St.

Louis is vitally interested in this Section. I don't think it's a matter pertaining to counties alone. I am certainly interested in this Section, but in view of the difficulties being encountered, I would move and I do move now, that we take it up section by section."

But that statement was made in connection with a suggestion made by Judge Stevens, who, with Mr. Bradshaw, Mr. Mayer and Mr. Hughes, led the discussion of Sections 18(a) to 18(*l*). At page 2099, Judge Stevens said:

"Mr. President, I would like to suggest that the whole section be read together. This Section 20 [Sections 18 (a) to 18(*l*)] is written not by sections but as a document, you might say one section more or less dependent upon another. I think the matter should be considered as a whole. We spent six weeks writing this and I suggest reading the whole and then let anybody offer any perfecting amendments or motions that they want."

At pages 2121–2122, it seems clear that Mr. Hullverson's interest in the sections was directed to the effect, if any, that they might have upon any future extension of the boundaries of the City of St. Louis.

For the reasons stated, we have concluded it was not intended that the City of St. Louis be invested with the powers enumerated in Sections 18(a) to 18(*l*).

The alternative writ should be and is quashed.

All concur except STORCKMAN, J., who dissents.

STORCKMAN, Judge (dissenting).

Since I am unable to agree with the conclusion of the majority opinion that it was not intended by the 1945 Constitution that the City of St. Louis be invested with the powers enumerated in § 18, I feel that I should make known the reasons for my dissent.

In approaching the question of whether the City of St. Louis is entitled to include in its charter provisions with respect to county offices and officers, we should keep in mind the well-established rules of construction.

In constitutional construction the instrument must be read as a whole and the court should resolve seemingly conflicting provisions by harmonizing and rendering every word operative if possible, so as to give effect to the whole. State ex rel. Moore v. Toberman, 363 Mo. 245, 250 S.W.2d 701, 705 [3].

All provisions of the constitution bearing upon a particular subject are to be considered together and effect given to the whole. State on inf. of McKittrick v. Williams, 346 Mo. 1003, 144 S.W.2d 98, 103 [10].

For convenient reference the series of sections dealing generally with county charters will be referred to as section 18. Likewise the sections 31–33, dealing specifically with the City of St. Louis will be referred to as section 31 unless otherwise indicated.

The fundamental inquiry is whether the 1945 Constitution shows an intent that the City of St. Louis as a county has a right to designate its county offices and officers and fix their salaries by charter provisions. More narrowly the question is whether an intent is shown to exclude the City of St. Louis from the benefits of § 18 and to limit it to a charter solely relating to municipal functions.

Each of these series of sections contain cross-references which are broad enough to include the other. Section 18(a) provides that any such county "may frame and adopt and amend a charter for its own government *as provided in this article*." Section 31, relating specifically to the City of St. Louis, is in the same article with § 18.

Section 31 provides that the city shall continue with its present charter "subject to changes and amendments *provided by the constitution or by law,* and with the powers, organization, rights and privileges *permitted by this constitution or by law.*" This cross-reference to "powers, organization, rights and privileges permitted by this constitution" is certainly broad enough to refer to § 18.

Provisions of the 1875 Constitution authorized a charter for the City of St. Louis but did nothing more than refer generally to adopting and amending the charter in much the same language now used in §§ 19 and 20 of the present constitution relating to cities of more than 10,000. The new language of § 31 must be given significance in accordance with well-recognized rules of construction. We see no logical reason why it cannot be properly said that the new language added in § 31 refers to and makes available to the City of St. Louis "the powers, organization, rights and privileges permitted" by § 18 of the constitution.

The first part of the last sentence of § 31 is a restriction; the changes and amendments must be *subject to* the constitution or law. The second part of the sentence denotes a grant or permission that was not in the former constitution; it says "with the powers, organization, rights and privileges *permitted* by this constitution or by law." The whole constitution is referred to by the section and the whole includes all of its parts. To hold otherwise is to treat these new references as meaningless.

A most significant factor is that the recognition of the City of St. Louis "as a county" is contained in § 31. If §§ 31–33 relate, as contended, solely to municipal functions, then there is no possible reason why this recognition should be placed where it is. A construction that renders a constitutional provision meaningless should not be adopted by the courts. State ex rel. Moore v. Toberman, 363 Mo. 245, 250 S.W. 2d 701, 705 [4].

Unless the City of St. Louis is necessarily excluded from the benefits and rights accorded to other counties, it would seem that there was an intent to include it because the City of St. Louis is recognized as a county and has more than the minimum population required.

If the constitution intends the provision for county charters to apply to the City of St. Louis, it could hardly be expected that the constitution would require the City of St. Louis to have two separate charters. The line of demarcation between municipal and county functions in the City of St. Louis is often quite indistinct. What is a municipal function and what is a county function has been the source of litigation in numerous cases over the years. This uncertainty is also shown in the Debates of the Constitutional Convention relating to this and other matters affecting the City of St. Louis.

If two separate charters are not required, then it would be most incongruous and unnecessary to have one charter body frame the organic law relating to the city and another for county functions. The chances of their harmonizing would be slight. The constitution provides what might reasonably be expected, one Board of Freeholders to write one charter for the City of St. Louis embracing both the city and county functions.

Sections 18(f) through 18(*l*) are general provisions relating to the mechanics for the formation and adoption of county charters. The provisions of 32(a), 32(b) and 33 are specific provisions relating solely to the City of St. Louis. It is a well-recognized rule of construction that where a conflict is presented between general and specific provisions, the specific will prevail. We see no violence in applying this rule to the present situation. In fact, it tends to harmonize and give effect to all of the constitutional provisions dealing with this subject matter.

Although it is by no means conclusive, the fact that the general assembly has rec-

ognized in § 50.010 that county charter provisions might be adopted pursuant to §§ 31 through 33 is of some weight. A contemporaneous legislative construction is entitled to and will be given serious consideration. Rathjen v. Reorganized School Dist., Mo., 284 S.W.2d 516, 526 [18].

There does not seem to be any valid reason why § 18(b) could not be applied to the City of St. Louis by a Board of Freeholders selected under § 31 et seq. The City of St. Louis as a county does not presently have a county court and all legislative functions of the city are presently vested in the Board of Aldermen. The present form of organization and administration for county purposes has not been attacked by the state as insufficient. This type of legislative body is required by § 32(b) and there is no reason why it could not handle whatever, if any, additional legislative functions there are on the county side. The city, of course, would have to provide, as it does now, public officers to perform the powers and duties delegated by the state to it as a county.

Apprehension is expressed that the City of St. Louis as a county might, or perhaps would be compelled, to take over from the state control of the police department if it adopts a county charter. It appears, however, that there is less reason for concern that this could be done in the City of St. Louis than, for example, in Kansas City if Jackson County were to adopt a county charter. I am unwilling to concede that this could occur in either place. Some of the reasons the City of St. Louis as a county could not disturb the existing police force setup are as follows:

1. Charter counties can exercise this municipal function only in the area of the county outside of incorporated cities and there is no such area in St. Louis. The territorial area of the City of St. Louis as a city and as a county exactly coincide. There is no county area outside of the city limits. Section 18(c) is expressly limited in its application; it provides that charter counties "may provide for the vesting and exercise of legislative power pertaining to public health, police and traffic, building construction, and planning and zoning, in the part of the county outside incorporated cities; * * *."

Because there is no county area outside of the city limits, the City of St. Louis would have no basis for claiming under that section the right to organize an additional police force. The other municipal functions mentioned have been performed by the city for many years without dire results.

2. It is recognized that in cities as well as in unincorporated areas the preservation of the peace and the protection of property "is a governmental duty, which devolves upon the state, and not upon its municipalities, any further than the state, in its sovereignty, may see fit to impose upon or delegate it to the municipalities." State ex rel. Hawes v. Mason, 153 Mo. 23, 54 S.W. 524, 529. There can be no county police force in the City of St. Louis except to the extent the general assembly imposes such "powers and duties" upon the city and its officers. The general assembly presently has the right, as it has done, to deprive the sheriff of St. Louis of his police powers and vest them in state officers, the police board of the City of St. Louis. Since the 1945 Constitution was adopted, sheriffs are no longer constitutional officers and the office could be abolished completely if the general assembly saw fit to do so. There is no limitation in § 18 on the "powers and duties" that the general assembly may withhold from the political subdivisions and vest in state officers instead. A fairly recent assertion of this power by the general assembly is the formation of the state highway patrol, a state agency for traffic regulation and law enforcement. Because of the peculiar status of the City of St. Louis, this power of the state over law enforcement is more evident and demonstrable than in the case of the other four counties presently eligible to adopt county charters.

3. The general assembly retains jurisdiction to determine what state powers and duties shall be delegated to counties and county officers for performance, as distinguished on the other hand from directing what county officers shall perform the powers and duties so delegated and fixing the salaries of county officers. Section 18(b) provides: "The charter shall provide * * * for the exercise of all *powers and duties* of counties and county officers *prescribed* by the constitution and laws of the state." Under this the general assembly may not only grant powers but may impose duties to be exercised by the charter counties and its officers. There is no conflict between this section and § 18(e) which provides that: "* * * no law shall provide for any other office or employee of the county or fix the salary of any of its officers or employees." In other words, the general assembly can determine the *powers and duties* to be granted or imposed upon the charter counties, but it cannot designate what officer shall perform them or set the salary of the county officers. This leaves the charter county free to allocate among its county officers the performance of powers and duties provided by law and to fix the salaries of its officials accordingly. If this is a good provision for other charter counties (and I think it is very salutary as did the delegates and evidently the people in adopting the constitution), I can see no justification for withholding it from the City of St. Louis. The greater population of the city would not be sufficient reason, because the day may not be far distant when the population of St. Louis County, and perhaps other counties, will exceed that of the City of St. Louis, hemmed in as it is by its unchangeable boundaries.

In the case of State ex inf. of Dalton ex rel. Shepley v. Gamble, Mo., 280 S.W.2d 656, 657, we were dealing with "the authority of the newly created police department of St. Louis County to take over and perform the law enforcement functions heretofore vested in the sheriff and constables of St. Louis County." We held in that case that the sheriff was a county officer and that St. Louis County, as a charter county, had the right to determine "what officer or agency will be designated to perform the duties" enjoined upon the county sheriff by state law. 280 S.W.2d 656, 660 [6, 7]. Whether the state had the right to withdraw the performance of "powers and duties" with respect to law enforcement from county officers and vest them in state officers or agencies was not involved and the case should not be considered as authority on that question. We think this is made clear by extending the quotation from the Shepley case to include the sentence in italics, 280 S.W.2d 656, 660 [4, 5]: "A county under the special charter provisions of our constitution is possessed to a limited extent of a dual nature and functions in a dual capacity. It must perform state functions over the entire county and may perform functions of a local or municipal nature at least in the unincorporated parts of the county. These are constitutional grants which are not subject to, but take precedence over, the legislative power. *St. Louis County alone has the right to determine 'the number, kinds, manner of selection, terms of office and salaries' of its county officers.*"

Greater clarity would have resulted if the first part of the second sentence quoted had been qualified to read: "It must perform *the* state functions *delegated to it* over the entire county," but such limitation is certainly implied or, at least, not excluded. Nor do we think that this question is ripe for decision in this case. All that is involved here is whether the City of St. Louis is entitled to partake of county charter powers, whatever they are.

The statement in respondent's brief that: "The primary purpose [is] to ascertain the intention of the framers of the Constitution of Missouri, 1945" is misleading. As stated in State ex rel. Harry L. Hussman Refrigerator & Supply Co. v. City of St. Louis, 319 Mo. 497, 5 S.W.2d 1080, 1084 [4]: "We are here concerned with what under the general rules of construction this constitu-

tional provision must be deemed to have said. 'The organic law is subject to the same general rules of construction as other laws, due regard being had to the broader objects and scope of the former, as a charter of popular government. The intent of such an instrument is the prime object to be attained in construing it.'" The weight to be given the debates is stated in State ex inf. of Dalton ex rel. Sheply v. Gamble, Mo., 280 S.W.2d 656, 661 [9]. The debates of the constitutional convention are inconclusive on the question here involved. The delegates from St. Louis, Jackson, Jasper and Buchanan counties were intensely interested in securing these charter privileges for their counties. Their opinions that it did not apply to the City of St. Louis are certainly not admissions against their interests. The failure of other delegates to express opposite opinions certainly would not create an estoppel. Even if the delegates who spoke did intend, such intent would not prevail if the language used is susceptible of a contrary intent.

If the intent were not to include the City of St. Louis, then it can be said most appropriately that an express exception should have been inserted removing the doubt and the inclusion which otherwise results from the broad language and the cross-references employed. Where no exceptions are made in terms, none will be made by mere implication or construction. State ex rel. Scott v. Dircks, 211 Mo. 568, 111 S.W. 1, 4.

I can see nothing inconsistent or disturbing about extending the applicable provisions of § 18 to the City of St. Louis. The policy or wisdom of extending these privileges to charter counties was decided by the people who adopted the constitution; it is not a matter for the court's consideration. McGrew v. Missouri Pacific R. Co., 230 Mo. 496, 132 S.W. 1076; McGrew v. Missouri Pacific R. Co., 258 Mo. 23, 166 S.W. 1033.

The City of St. Louis is within the class of eligible counties. It is not expressly excluded. Under well-established rules of construction, a fair and reasonable interpretation of these broad constitutional provisions is that the City of St. Louis was intended to have the same benefits as other charter counties.

I regret that time does not permit a better organized and more succinct statement of my views.

On Rehearing.

PER CURIAM.

Relators' motion for rehearing is largely devoted to a reargument of the issues determined in our original opinion. A careful review of the briefs filed upon submission of the case and the briefs filed in support of the motion for rehearing, including the brief filed by the City of St. Louis as *amicus curiæ*, leaves us convinced that the case was correctly ruled.

However, relators have challenged a statement made argumentatively in the course of the opinion. Although the statement was made and is of moment only as one of the least important of several independent approaches to the ultimate ascertainment of any intent on the part of the framers of the Constitution to make art. 6, Sections 18(a) to 18(*l*), V.A.M.S., applicable to the City of St. Louis, relators' challenge of it, nevertheless, deserves mention. We said, in effect, that prior to adoption of the Constitution of 1945 the State had zealously guarded its right to maintain the police departments of both the City of St. Louis and Kansas City and that the exercise by the City of St. Louis of the powers given to counties by Sections 18(a) to 18(*l*) would require it to take over its state-maintained police department, thereby creating the anomalous situation of leaving the Kansas City police department under the jurisdiction of the State. Relators say that if adoption of a charter by the City of St. Louis under Sections 18(a) to 18(*l*) would oblige it to assume control of its police department, it must follow that if in the future Jackson County should or-

ganize as a special charter county under Sections 18(a) to 18(*l*) it would also be obliged to assume jurisdiction of the police department of Kansas City.

Not so, we think. Jackson County encompasses territory beyond the confines of Kansas City. As one of the 114 *de jure* counties of the State, it maintains co-extensively with its boundaries (including Kansas City) an active sheriff's department in accord with the mandatory provisions of the general statutes relating to the powers and duties of sheriffs in each of said counties. Sections 57.010 to 57.200. Consequently, if and when Jackson County adopts special charter government, it could meet the requirements of Section 18(b) that it "provide * * * for the exercise of all powers and duties of counties and county officers prescribed by the constitution and laws of the state", without, in any manner, encroaching upon the state-maintained police department of Kansas City; and, at the same time, avail itself of the services of the latter within the confines of the city to whatever extent the State would permit or afford it. On the other hand, the City of St. Louis, which does not maintain a sheriff's department possessed of jurisdiction to "quell and suppress assaults and batteries, riots, routs, affrays, and insurrections * * * apprehend and commit to jail all felons and traitors * * *", as required of all of the 114 *de jure* counties by Section 57.100, of necessity would be called upon to take over the functioning of the police department, at least to the extent of providing for the exercise of the duties imposed upon sheriffs of the 114 *de jure* counties of the State. This, for the reason that there is no other agency in the City of St. Louis through which the powers generally exercised by sheriffs in the 114 counties of the State may be there exercised, as Section 18(b) requires of all counties adopting special charters.

Certain of the contentions in the city's brief also deserve mention. One is that in "construing the Constitution as a whole it is necessary to assume that the framers of the Constitution, by recognizing the City of St. Louis as a county under a home rule article of the Constitution, necessarily intended that there not be one measure of home rule for certain counties and another measure of home rule or a lack of home rule for others."

Logically, such a statement begs the question in its entirety. The very fact that the framers of the Constitution deemed it necessary to set forth definitively and separately the charter powers conferred exclusively upon the City of St. Louis in Sections 31–33 and to clearly indicate therein the reason for so doing, to wit: the problems peculiar to its dual existence, permits an inference that Sections 18(a) to 18(*l*), defining the charter powers of counties not conjoined with cities, and Sections 19–20, defining the charter powers of cities not conjoined with counties, were not applicable to the City of St. Louis. But such an inference was not indulged. To the contrary, our conclusions were specifically predicated upon a detailed study and analysis of all of the aforesaid provisions.

And finally, the city's brief, in the last paragraph, states: "We find it difficult to believe for the reasons suggested herein that the largest unit of Missouri government was intended to be discriminated against by the framers of the 1945 Constitution."

Certainly, we found no evidence of any intended discrimination against the city by the framers of the Constitution. Rather did we find a painstaking attempt to meet and deal with a problem that concededly has vexed municipal, county and state government ever since St. Louis elected many years ago to assume its dual status of city and county. Whether the result of their labor, as expressed in Sections 31–33, is sound or unsound, good or bad, is not ours to say; that is strictly a political function. Our duty, in this action, is to ascertain and declare the true intent and meaning of

the provisions in question. We believe the original opinion does that.

The motion for rehearing is overruled.

STORCKMAN, J., dissents.

STORCKMAN, Judge (dissent from additional opinion).

Feeling that the motion for rehearing should be granted, I must respectfully dissent from the additional majority opinion for reasons which I will briefly state.

One of the bases of fundamental disagreement is demonstrated by the statement in the third paragraph of the additional opinion to the effect that if the City of St. Louis adopted a charter with county powers it " * * * of necessity would be called upon to take over the functioning of the police department, at least to the extent of providing for the exercise of the duties imposed upon sheriffs of the 114 *de jure* counties of the State."

This interpretation imposes on the general assembly a limitation not intended by the constitution. It in effect says that the § 18 series prohibits the legislature from classifying local police or peace officers as "state officers."

The statement fails to recognize that police officers of the City of St. Louis are state officers and that the only limitations in these county charter sections are with respect to *county* officers, not *state* officers. In Section 84.330 RSMo 1949, V.A.M.S., it is clearly provided that: "The members of the police force of the cities covered by sections 84.010 to 84.340, organized and appointed by the police commissioners of said cities, are hereby declared to be officers of the said cities, under the charter and ordinances thereof, and also to be *officers of the state* of Missouri, * * *." (Italics within quotations have been supplied unless otherwise noted.)

The City of St. Louis is prohibited from having a police force other than these state officers. Section 84.210(2). There are similar statutes pertaining to Kansas City. See § 84.710(1) and § 84.770.

This court, pursuant to the statutes cited, has held the members of the police force of St. Louis and Kansas City to be officers of the state as well as officers of their respective cities. American Fire Alarm Co. v. Board of Police Commissioners, 285 Mo. 581, 227 S.W. 114, 116 [1].

The sheriff of the City of St. Louis is deprived of his traditional powers as a conservator of the peace by a statute which provides that the police board is vested with the power "to assume the control and command of all conservators of the peace of the *county or city* * * *." § 84.-200.

This classification and control of the police as state officers would not be affected or impaired by a complete home rule charter because the constitution does not authorize a charter county or charter city to perform the functions of or exercise jurisdiction over *state* officers.

Section 18(b) requires counties adopting charters to provide "for the exercise of all powers and duties of *counties* and *county officers* prescribed by the constitution and laws of the state." This is not a grant of power but a safeguard designed to insure that charter counties and their officers shall not escape the performance of the duties enjoined upon them by state laws. It is not designed to prohibit the legislature from withdrawing from charter county officers the performance of functions and vesting them in state officers as it has done in the case of the City of St. Louis.

The legislative limitation contained in § 18(e) has the effect of permitting charter counties to determine with a few exceptions "the number, kinds, manner of selection, terms of office and salaries of the *county* officers." See also § 18(b). A constitutional provision of similar effect pertaining to charter cities is § 22, Article VI.

None of these sections, 18(a) through 18(*l*), undertakes to control "state officers" even though operating at a county level, nor to determine what state or governmental functions shall be assigned or delegated for performance by *county* officers. The general assembly remains free to impose or withhold from county officers the performance of state functions as it sees fit.

The general assembly could give charter counties the same treatment it has given the City of St. Louis and Kansas City. It could enact valid statutes providing that in counties having more than 85,000 inhabitants the police or other peace officers shall be *state* officers and that such counties shall not have the power or authority to maintain any other police force. This would not be contrary to §§ 18(a) to 18(*l*). Thus the police department of St. Louis County, a charter county, could be transformed by law into a state agency.

In disclaiming a purpose to interfere with the present setup of the police department, the relators were not being gracious but realistic. The City of St. Louis, as a city or as a county, would have no right or authority to do so as long as §§ 84.200, 84.210 and 84.330 of the statutes remain in force.

In the second paragraph of the additional opinion reference is made to " * * * the ultimate ascertainment of any intent on the part of the framers of the Constitution to make art. 6, Sections 18(a) to 18(*l*), V.A.M.S., applicable to the City of St. Louis * * *." Aside from the rule for constitutional construction indicated, the statement demonstrates that the approach and emphasis has been on the general provisions for charter counties rather than the specific sections relating to the City of St. Louis.

There can be no doubt that §§ 18(a) to 18(*l*) do not apply to the City of St. Louis in their entirety. However, to say that these provisions can have no effect beyond the confines of §§ 18(a) to 18(*l*) is to contradict the express language of 18(a) which

states that a county charter may be adopted and amended "as provided in this *article*." This language extends the application of the sections and should be controlling. Sections 18(a) to 18(*l*) and §§ 31–33 are all in Article VI of the constitution.

The right of the City of St. Louis to include in its charter regulations with respect to "the number, kinds, manner of selection, terms of office and salaries of the *county* officers," should be determined primarily from a consideration of the language of §§ 31–33. The convention records disclose no intent or purpose to restrict the application of these particular sections.

The general interest and far-reaching importance of the holdings of the majority opinion impels me to record this dissenting view in spite of my reluctance to belabor the issues.