Dear Representative Molloy:
This opinion is in response to your questions asking:
 1. Can a board of freeholders organized under Article VI, Section 30(a), [Missouri Constitution (as amended 1966)] disincorporate existing municipalities and incorporate new municipalities?
 2. Can the board of freeholders appointed under Article VI, Section 30(a) consolidate municipalities only in St. Louis County in light of language which suggests that reorganization should occur both in the City of St. Louis and St. Louis County "to formulate and adopt any other plan for the partial or complete government of all or any part of the city and the county?"
 3. Does language in Article VI, Section 30(a), "(4) to establish a metropolitan district or districts for the functional administration of services common to the area included therein" authorize the board of freeholders to consolidate existing municipalities and incorporate new municipalities?
By "municipalities" we understand you to denote cities, towns and villages in St. Louis County as opposed to the broader meaning sometimes given to that term, as in St. Louis HousingAuthority v. City of St. Louis, 239 S.W.2d 289 (Mo. banc 1951).
Article VI, Section 30(a), Missouri Constitution (as amended 1966) provides, in pertinent part:
 The people of the city of St. Louis and the people of the county of St. Louis shall have power (1) to consolidate the territories and governments of the city and county into one political subdivision under the municipal government of the city of St. Louis; or, (2) to extend the territorial boundaries of the county so as to embrace the territory within the city and to reorganize and consolidate the county governments of the city and county, and adjust their relations as thus united, and thereafter the city may extend its limits in the manner provided by law for other cities; or, (3) to enlarge the present or future limits of the city by annexing thereto part of the territory of the county, and to confer upon the city exclusive jurisdiction of the territory so annexed to the city; or, (4) to establish a metropolitan district or districts for the functional administration of services common to the area included therein; or, (5) to formulate and adopt any other plan for the partial or complete government of all or any part of the city and the county. The powers so given shall be exercised by the vote of the people of the city and county upon a plan prepared by a board of freeholders consisting of nineteen members, nine of whom shall be electors of the city and nine electors of the county and one an elector of some other county. . . . .
Article VI, Section 30(b), Missouri Constitution (1945), provides, in pertinent part:
 The board shall prepare and propose a plan for the execution of the powers herein granted and for the adjustment of all matters and issues arising thereunder. . . . The plan shall be signed in duplicate by the board or a majority thereof, and one copy shall be returned to the officials having general charge of elections in the city, and the other to such officials in the county, within one year after the appointment of the board. Said election officials shall cause separate elections to be held in the city and county, on the day fixed by the freeholders, at which the plan shall be submitted to the qualified voters of the city and county separately. . . . If a majority of the qualified electors of the city voting thereon, and a majority of the qualified electors of the county voting thereon at the separate election shall vote for the plan, then, at such time as shall be prescribed therein, the same shall become the organic law of the territory therein defined, and shall take the place of and supersede all laws, charter provisions and ordinances inconsistent therewith relating to said territory. If the plan be adopted, copies thereof, . . . shall be deposited in the office of the secretary of state and recorded in the office of the recorder of deeds for the city, and in the office of the recorder of deeds of the present county, and the courts of this state shall take judicial notice thereof.
In regard to the first question, the above-quoted sections of the Constitution demonstrate that the board of freeholders has no power to disincorporate existing municipalities and incorporate new ones. The only power the board has is to propose a plan providing for such matters and to present it to the city and county election officials in order for the people in the city and county to vote on it. Only the vote of a majority in the city and a majority in the county has the power to make the plan law.
Implicit in the first question, of course, is whether the provisions of Article VI, Section 30(a) allow for a plan which both disincorporates and incorporates municipalities. This issue is also at the heart of questions two and three.
Of the five categories of reorganization plans which Article VI, Section 30(a) gives the city and county the power to adopt, only the fifth type could involve both the disincorporation and incorporation of cities, towns and villages in the county. The fourth type of plan involves only the creation of special purpose districts to provide common services such as the Metropolitan St. Louis Sewer District does. This does not include the power to disincorporate and incorporate cities, towns and villages.[1]
Under the fifth category, the question arises as to whether a plan authorized thereunder must effect reorganization in both the city and the county? Interpretation of Article VI, Section 30(a) and (b) is guided by the following principles:
 Rules employed in construction of constitutional provisions are the same as those employed in construction of statutes, but the former are to be given a broader construction due to their more permanent character. . . . Crucial words must be viewed in context and it must be assumed that words used were not intended to be meaningless. . . . This Court has recognized that in construction of constitutional provisions, it should undertake to ascribe to words the meaning which the people understood them to have when they adopted the provision. . . . "The framers of the Constitution and the people who adopted it `must be understood to have employed words in their natural sense, and to have intended what they have said.' This is but saying that no forced or unnatural construction is to be put upon their language." . . . The meaning of the words in the provision, as conveyed to the voters, is presumed to be their natural and ordinary meaning. . . . The ordinary, and commonly understood meaning is derived from the dictionary. . . . Moreover, the grammatical order and selection of the associated words as arranged by the drafters is also indicative of the natural significance of the words employed. . . . Of course, this Court must give due regard to the primary objectives of the provision under scrutiny as viewed in harmony with all related provisions, considered as a whole. [citations omitted] Roberts v. McNary, 636 S.W.2d 332, 335
(Mo. banc 1982).
The plain language of the fifth category in Article VI, Section 30(a) supports the interpretation that it empowers a plan which must effect reorganization in all or part of both
the county and the city because the language provides that the plan be for the government "of all or any part of the city and
the county." [emphasis added]. If the disjunctive would have been intended, "or" would have been used instead of "and".Boone County Court v. State, 631 S.W.2d 321, 325 (Mo. banc 1982).
The key principle here is to determine the primary objectives of the constitutional sections involved, and which construction given the words "all or any part of the city and the county" would be in harmony with those objectives and with the rest of the provisions of those sections. All of the procedures set forth in subsections (a) and (b) of Section 30 require joint participation by both the City of St. Louis and St. Louis County. Immediately following the five categories of powers set forth in subsection (a), the Constitution directs that these powers should be exercised by the vote of the people from both the city and the county. The plan to be presented to the voters is formulated by a board of freeholders consisting in part of nine members each from both the city and the county.[2]
The chief executive of each entity appoints the members from his respective jurisdiction with the respective legislative body approving the same. The board of freeholders is not appointed until separate petitions are received signed by the required number of voters from both the city and the county. Section 30(b) also follows this joint scheme providing that the board's expenses are to be shared equally by the city and the county and that the board's final plan of governmental reorganization is to be submitted to election officials of both the city and the county. Those officials cause "separate elections to be held in the city and county . . . at which the plan shall be submitted to the qualified voters of the city and county separately." The plan becomes law only if a majority in each of the city and the county vote for the plan at separate elections. If adopted, the plan is certified to by election officials of both the city and the county and recorded in the office of the recorder of deeds for the city and in the office of the recorder of deeds for the county.
The scheme set out in subsections (a) and (b) supports only the conclusion that the language setting forth the fifth category of powers is to be taken at its plain meaning, that is, the plan must involve reorganization to some extent of the city as well as of the county. It is evident that the five categories of powers set forth in Section 30(a) are for the purpose of resolving problems common to both the city and the county by means of providing for plans involving both entities. The fifth category of plan need not affect all of the city or all of the county but must involve in the reorganization at least a part or some aspect of both entities. A plan which involves disincorporating and incorporating municipalities only in the county while making no provisions which change matters in the City of St. Louis would not be authorized by Article VI, Section 30(a).
 "In placing a construction on a constitution, or any clause or part thereof, a court should look to the history of the times and examine the state of things existing when the constitution was framed and adopted, in order to ascertain the old law, the mischief and the remedy." State ex rel. O'Connor v. Riedel, 329 Mo. 616, 46 S.W.2d 131, 133-134 (Mo. banc 1932).
An examination of the debates of the Constitutional Convention of 1943-1944 which formulated what eventually became Article VI, Section 30(a) (as it existed before 1966) and (b) demonstrates that the primary concern of the framers of the constitution was to accommodate the competing interests of the City of St. Louis and of the County of St. Louis concerning the desire of the city to expand.[3] The "mischief" addressed was that the city wanted to free itself of the stifling effects of its inability to expand beyond its boundaries while the county acted to protect its independence from the city and its problems by insisting on a county-wide vote on any proposed changes.[4]
The following quotations of statements made by delegates to the constitutional convention best express their concerns:
 "St. Louis had a serious situation which it wanted to correct. The County of St. Louis was proud of its independence as a county and felt that the various plans suggested [in the Metropolitan Government Committee] were going to take away from them something which they rightfully possessed and it didn't appear that anything could work out of it." Statement by Delegate Hughes, Debates of the Missouri Constitution 1945,
Vol. X, p. 2890.
 "The people of St. Louis County, gentlemen, are not going to give up the control of their schools to St. Louis if they can avoid it. They're not going to give up the control over these larger cities [those contiguous to the city] to St. Louis." Statement by Delegate Stevens, Id. at p. 2930.
 "Now, there was a separate election provided both in my minority report and in the majority report and I agree that that's a sacred provision in both these reports and that is the democratic way to handle this situation." Statement by Delegate Heege, Id. at p. 3057.
The fifth category of powers was added to Section 30(a) at the general election on November 8, 1966. This was after two attempts had been made to achieve some type of metropolitan-wide reorganization. In 1959, the board of freeholders under Section 30(a) and (b) submitted a plan to create a multipurpose metropolitan district. It was defeated. In 1962, a constitutional amendment which would have created a new municipal corporation embracing the limits of the old city and county in a so-called "borough plan" was also defeated.
The text of the 1966 amendment is found at Laws of Missouri 1965, p. 675. The amendment began as House Joint Resolution No. 1 in the Seventy-Third General Assembly. A legislative title of the joint resolution as well as the ballot title both contained the same type of language as in the amendment itself providing that the amendment affect both the city and the county.[5] There is no language or legislative history to support a contrary intent.[6] The 1966 amendment appears, then, to be an attempt to grant a more flexible authority for the freeholders to be able to develop any of a wide range of plans to resolve the city-county problems.[7] There is no indication that this amendment was to give authority for the board of freeholders to submit a plan to resolve only county problems by governmental reorganization affecting only the county and its municipalities. If the legislature would have wanted to submit a constitutional amendment to the voters authorizing a plan to affect the county only, it needed only to have changed the "and" to "or" for the fifth category to read ". . . all or any part of the city or the county". It is the term "or" which indicates the disjunctive when used in the constitution and not the word "and". Boone County Court v. State, supra, at 325.
As the constitutional debates demonstrate, the problem, or "mischief", addressed by Article VI, Section 30(a) and (b) was one in which the city was seeking to alleviate its economic problems by enlarging or consolidating at what the county considered to be the county's expense. The idea that the county could use these provisions for the sole purpose of achieving reorganization within its own borders, such as in the consolidation of municipalities, was never mentioned and apparently never contemplated. This is reflected in the required joint participation of the city and the county in the formulation and enactment of any of the categories of plans which Section 30(a) empowers the people to enact. It would make little sense for the constitution to have required the city to participate in the formulation and enactment of a plan which changed only parts of the county while leaving the city untouched. Framers of the constitution provided that votes be taken by both the county and the city because each of the first four powers set forth in subsection (a) required a plan which makes actual changes to both the city and the county in matters of legal characteristics, such as territory, powers, jurisdiction and government structure. Since the amendment in 1966 left intact the original provisions mandating participation by both the city and the county in the formulation and enactment of any plan of reorganization, it is logical to infer that the fifth power provided by the 1966 amendment was of the same nature as the original four powers in that it was to provide for actual changes in both the city and the county.
To interpret the constitution otherwise would allow the spectacle of having the city go through all the involved procedures set forth in Section 30(a) and (b), including a vote by all its qualified voters, when the city and its citizens have no governmental interest in the result of the proceedings. Legislation, and particularly the constitution, should never be interpreted to yield an absurd or unreasonable consequence.Theodoro v. Department of Liquor Control, 527 S.W.2d 350, 353
(Mo. banc 1975); and Tribune Publishing Company v. Curators ofUniversity of Missouri, 661 S.W.2d 575, 583 (Mo.App. 1983).
Therefore, taking into consideration the plain meaning of the words used, the relationship of those words to the entire structure of Section 30(a) and (b), and the "mischief" intended to be addressed by that section and by the 1966 amendment to it, this office can only conclude that none of the five categories of powers set forth in Section 30(a) would allow the board of freeholders to propose a plan the only effect of which is to incorporate and disincorporate cities, towns and villages within the boundaries of St. Louis County.
CONCLUSION
Therefore, it is the opinion of this office that:
1. A board of freeholders organized under Article VI, Section 30(a), Missouri Constitution (as amended 1966) has the power to propose for a vote by the qualified electors of the City of St. Louis and St. Louis County a plan involving the disincorporation of existing municipalities and the incorporation of new municipalities provided the changes affect all or part of both the City of St. Louis and St. Louis County.
2. The people of the City of St. Louis and St. Louis County do not have the power under Article VI, Section 30(a) to enact a plan which consolidates municipalities in St. Louis County without providing for changes in all or part of the City of St. Louis.
3. The language in Article VI, Section 30(a) which provides "to establish a metropolitan district or districts for the functional administration of services common to the area included therein" does not authorize the board of freeholders to consolidate existing municipalities and incorporate new municipalities.
Very truly yours,
 WILLIAM L. WEBSTER Attorney General
[1] The explanations of this fourth category of power provided at the constitutional convention of 1943-1944 support this interpretation.
 "The idea of functional cooperations between the city and county and in view of the direction which this Convention seemed headed, it seemed appropriate that we should put into this plan some scheme whereby there might be functional cooperations between the city and the county. That is this fourth provision." Statement by Delegate Hughes, Debates of the Missouri Constitution 1945,
Vol. X, p. 2891.
 "Now, that's the thing Mayor Kaufmann started out to get, when he was talking last fall he wanted to consolidate functional services by metropolitan districts. What does that mean? It means that we can have sewer districts comprising the whole of St. Louis and all of St. Louis County, that [the delegate went on to use such examples as metropolitan-wide fire districts, water districts and airport districts.]." Statement by Delegate Stevens, Id. at pp. 2938-2939.
However at least one delegate expressed some problem about the term "functional administration of services" being too ambiguous and susceptible of too broad of an interpretation.Id. at p. 3061.
The proceedings and debates of the constitutional convention can be consulted to assist in the interpretation of the constitution even though they are not of binding force and their value depends upon the circumstances. Stemmler v.Einstein, 297 S.W.2d 467, 475 (Mo. banc 1956).
[2] The board is completed by the governor appointing a nineteenth freeholder who must be a resident of the state but not of the city or the county. Article VI, Section 30(b), Missouri Constitution. The purpose of this freeholder was to provide an objective and fair vote to break any deadlocks between the city and the county. Debates of the MissouriConstitution 1945, Vol. X, p. 2891; Faust, M.L., ConstitutionMaking in Missouri: The Convention of 1943-1944, National Municipal League, N.Y., N.Y., 1971, p. 123.
[3] The debates on Article VI, Section 30(a) and (b) are found inDebates of the Missouri Constitution 1945, Vol. X, pp. 2887-2904, 2907-2975, 2980-3033, 3035-3108.
[4] Under a constitutional amendment adopted in 1924, which closely resembled Article VI, Section 30(a) and (b), a city-county consolidation plan was proposed in 1926. It won overwhelmingly in the city but lost decisively in the county. In 1930, a constitutional amendment to consolidate the city and county as a federated city won narrowly in the city and lost in the county. It was rejected in the statewide vote. Faust,supra, at p. 115.
[5] The title of the joint resolution provided:
 Joint resolution submitting to the qualified voters of the state of Missouri an amendment repealing section 30(a) of Article VI of the Constitution of the State of Missouri, relating to the City and County of St. Louis, and adopting one new section in lieu thereof relating to the same subject. [emphasis added]
The ballot title provided:
 House Joint Resolution No. 1 — Broadens the authority of the people of St. Louis city and St. Louis county to formulate and adopt a plan for the partial or complete government of all or any part of the city and the county of St. Louis; and provides that the city's members of the board of freeholders shall be appointed by the mayor with the approval of a majority of the board of aldermen and that the county's members of the board of freeholders shall be appointed by the county supervisor with the approval of a majority of the county council. [emphasis added] Laws of Missouri, 1965, p. 675.
[6] An examination of the House and Senate Journals of the Seventy-Third General Assembly indicates that House Joint Resolution No. 1 was not amended during its passage through those chambers. The Senate defeated a motion to amend it on the floor by deleting the words "and thereafter the city may extend its limits in the manner provided by law for other cities." Senate Journal, Seventy-Third General Assembly, p. 811. An attempt to amend the joint resolution on the floor of the House was also defeated. House Journal, Seventy-Third General Assembly, p. 373. The text of that amendment is not set out in the Journal nor has it been retained in the state archives.
[7] Newspaper articles around the time of the election on the 1966 amendment, or the "Fifth Avenue Amendment" as it came to be called, all indicate that this amendment must provide flexibility for both the city and the county to resolve their common problems.
 "The constitutional amendment, giving the city and county wide latitude in co-operative efforts, needs a simple majority for approval." [emphasis added] Kansas City Star, October 16, 1966
 "It [the amendment] gives much broader latitude to a board of freeholders to combine some or all governmental services of the city and county, with the approval of the voters." "Jack Flack Reports", [emphasis added] St. Louis Globe-Democrat, October 19, 1966.
 "The so-called `fifth avenue' amendment to the Constitution, to give St. Louis city and county an additional way of solving some of their mutual governmental problems, won by a 3,749-vote margin, . . ."
* * *
 "But the final affirmative vote puts it in the Constitution and provides one more way for the city and county to co-operate in governmental problems that affect them both." [emphasis added] St. Louis Post Dispatch, December 4, 1966.
 "Fifth avenue gives the people of city and county the right to frame and adopt any plan they find acceptable for the solution of common governmental problems. Until now the Constitution had limited attempts at solutions to four specific devices. . . . .
 "Experience growing out of the metropolitan freeholder deliberations of 1958-59 demonstrate these grants were far too restrictive. Shortly thereafter former Mayor Tucker began the campaign for a fifth option, which has now been narrowly approved in a state-wide vote in which St. Louis county's view was slightly on the negative side.
 "The question is what if anything city and county should do with their new authority. . . . . What are the areas of mutual concern in which use of the fifth option would be necessary, desirable and probably acceptable by the concurrent majorities required by the Constitution?
 "In the long history of efforts to institutionalize city-county co-operation
under this section of the Constitution, only one scheme has proved acceptable to both city and county voters, the plan for the Metropolitan Sewer District. . . . .
 "Getting city and county to co-operate is going to be difficult enough in any case. Recent history has demonstrated the clear need for study and agreement by both a citizens group and the area's elected political leadership before freeholders are called into action." [emphasis added] Editorial, St. Louis Post Dispatch,
December 7, 1966.